**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Civil Action No. 8:23-cv-416 |
| GENERAL DYNAMICS CORPORATION and DOW CHEMICAL COMPANY, | ) | |
| Defendant. | ) | |
| GENERAL DYNAMICS CORPORATION, | ) | |
| Counterclaimant, | ) | |
| vs. | ) | |
| UNITED STATES OF AMERICA | ) | |
| Counter-Defendant. | ) | |

**GENERAL DYNAMICS CORPORATION'S ANSWER,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

During the Cold War, the United States of America sought the aid of contractors to build the intercontinental ballistic missile ("ICBM") system necessary to protect the Nation. To induce the contractors to perform that work, the Government expressly and comprehensively promised that the contractors would not be responsible for any harm or damage their work caused. Decades later, the Government now claims that the work that General Dynamics' predecessor performed at the Government's direction and in furtherance of the Nation's defense resulted in environmental damage, and demands that General Dynamics pay for the costs to remediate that environmental damage.

1

This Court should reject the Government's demand, which is unlawful, inequitable, and factually unfounded.  First, the parties here already agreed that General Dynamics would not be responsible for, and that the Government would not seek to recover for, damage resulting from the performance of the contract, save in limited circumstances.  Those contractual provisions decide this case.  The Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq* ("CERCLA"), respects agreements between parties that one party will not hold the other liable for environmental clean-up costs.

Second, independently of the Government's promises, it would be improper to hold General Dynamics responsible for environmental damage arising from work performed at the Government's behest at a military installation that was, at all relevant times, owned and operated by the Government.  The Government selected the site, designed and constructed the site infrastructure that allowed chemicals to be released into the environment, and then directed General Dynamics to use and release those chemicals into the environment in order to prevent the potential destruction of the entire launch facility.

General Dynamics did nothing more – and the Government does not allege that General Dynamics did anything more – than carry out the Government's directives.  The Government, not General Dynamics, should bear the clean-up costs for which it is responsible.  General Dynamics thus hereby answers the Government's allegations and presents its defenses and counterclaim to the Government's Complaint.

## **ANSWER**

General Dynamics answers the United States of America's Complaint as follows.  To the extent the Complaint makes allegations against "Defendants" without identifying a specific Defendant, General Dynamics answers only as the allegation pertains to it, and denies knowledge

or information sufficient to form a belief about the truth of allegations pertaining to any other Defendant. The allegations in the Complaint relate to activities that occurred or are alleged to have occurred decades ago. General Dynamics' investigation continues. Its Answer is based on the knowledge or information available to it at this time.

1. General Dynamics admits that this is a civil action by the United States (sometimes referred to as the "Government") under Sections 107(a) and 113(g)(2) of CERCLA regarding response costs allegedly incurred by the United States at the Nebraska Ordnance Plant Superfund Site, located in Mead, Nebraska (the "Site"). General Dynamics lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 1, and therefore denies the same.

2. General Dynamics is not required to respond to Paragraph 2 because it asserts legal conclusions, not factual allegations. However, General Dynamics does not dispute that the Court has jurisdiction over this matter.

3. General Dynamics is not required to respond to Paragraph 3 because it asserts legal conclusions, not factual allegations. However, General Dynamics does not dispute that the District of Nebraska is a proper venue for this matter.

4. General Dynamics is not required to respond to Paragraph 4 because it asserts legal conclusions, not factual allegations. To the extent that Paragraph 4 includes factual allegations, General Dynamics denies those allegations.

5. General Dynamics admits that the Site occupies approximately 17,250 acres and is located in Saunders County, Nebraska. General Dynamics also admits that the soil and groundwater at the Site are contaminated with explosives and the organic solvent trichloroethylene ("TCE"). General Dynamics lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 5, and therefore denies the same.

6.     General Dynamics admits that the Government and/or its contractors constructed a bomb loading plant on the Site and that the plant produced aerial bombs for World War II ("WWII").  General Dynamics lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 6, and therefore denies the same.

7.     General Dynamics admits that the Nebraska Ordnance Plant ("NOP") was owned by the Government and that various contractors, including but not limited to the Nebraska Defense Corporation, manufactured ordnance at NOP.  General Dynamics lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 7, and therefore denies the same.

8.     General Dynamics admits the allegations in Paragraph 8 but further states that the United States' description of the operations at the Site during WWII is incomplete in that there were numerous other operations conducted at the Site during WWII including but not limited to the cleaning of ordnance-related parts and components.

9.     General Dynamics admits that the Nebraska Defense Corporation manufactured ordnance at NOP pursuant to its contract with the Government.  General Dynamics denies that NOP commenced operations in 1943 and that NOP was placed into standby status in September 1945.  As alleged in General Dynamics' counterclaim, Load Line 1 at NOP was activated in October 1942 and NOP was placed into standby status in November 1945.  General Dynamics lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 9, and therefore denies the same.

10.     General Dynamics admits that NOP was reactivated in 1951 and that National Gypsum Company, pursuant to its contract with the Government, assembled bombs and various ordnance at NOP until sometime in 1956.  General Dynamics lacks knowledge or information

sufficient to admit or deny any remaining allegations in Paragraph 10, and therefore denies the same.

11.    General Dynamics admits that the United States Army Corps of Engineers ("USACE") was responsible for and directed the construction of the infrastructure associated with the Atlas Missile facility (the "AMA") located at the Site.  General Dynamics lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 11, and therefore denies the same.

12.    General Dynamics admits that General Dynamics and its subcontractors installed Ground Support Equipment and Ground Operating Equipment at the AMA for three Atlas "D" series missiles that were deployed at the AMA beginning in or about January 1960 under the close supervision and direction of the Government.  General Dynamics lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 12, and therefore denies the same.

13.    General Dynamics admits that the Government required General Dynamics and The Dow Chemical Company ("Dow") to use TCE to clean Atlas missiles and components using Government-prescribed specifications and processes to meet the Government's stringent cleaning requirements.  Title to any TCE used by General Dynamics and Dow to clean the Atlas missiles and components passed to and vested in the Government upon delivery of the TCE to the Site. General Dynamics denies the remaining allegations in Paragraph 13.

14.    General Dynamics admits that, pursuant to its contract with the Government, once General Dynamics demonstrated the operational status of each of the Atlas D missiles at the AMA, the United States Air Force (the "Air Force") assumed full control over and took responsibility for each of the missiles.  General Dynamics denies the remaining allegations in Paragraph 14.

15. General Dynamics admits that in approximately July 1961, General Dynamics performed work associated with the Golden Ram Program at the Site. General Dynamics further admits that the Golden Ram Program was intended to improve the reliability of the Atlas D missiles, and more specifically, to modify the launch procedures in response to failures by the Air Force to successfully launch missiles from the Vandenberg Air Force Base. General Dynamics lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 15, and therefore denies the same.

16. "Dual Propellant Loading Program" as used in Paragraph 16 is ambiguous, and General Dynamics therefore denies the allegations in Paragraph 16.

17. General Dynamics admits that the Government required General Dynamics and Dow to use TCE to clean Atlas missiles and components using Government-prescribed specifications and processes to meet the Government's stringent cleaning requirements. Title to any TCE used by General Dynamics and Dow passed to and vested in the Government upon delivery of the TCE to the Site. General Dynamics denies the remaining allegations in Paragraph 17.

18. General Dynamics admits that Dow Industrial Services, a division of Dow, furnished facilities and equipment, including TCE and personnel, to clean Atlas missiles and components using Government-prescribed specifications and processes to meet the Government's stringent cleaning requirements. Title to any TCE used by General Dynamics and Dow to clean the Atlas missiles and components passed to and vested in the Government upon delivery of the TCE to the Site. General Dynamics denies the remaining allegations in Paragraph 18.

19. General Dynamics lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 19, and therefore denies the same.

20.    General Dynamics admits that the University of Nebraska established an Agricultural Research and Development Center at the Site.  General Dynamics lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 20, and therefore denies the same.

21.    General Dynamics admits the allegations in Paragraph 21.

22.    General Dynamics admits the allegations in Paragraph 22.

23.    General Dynamics admits that Operable Unit 1 ("OU1") was directed at the control and remediation of explosive compounds in the upper four feet of soil in the load line areas. General Dynamics admits that Operable Unit 2 ("OU2") was directed at the control and remediation of contaminated groundwater, soils contaminated with TCE, and soil contamination by explosives greater than four feet below ground surface.  General Dynamics denies any remaining allegations in Paragraph 23.

24.    General Dynamics admits that USACE commenced a Remedial Investigation ("RI") of OU2 in 1992 that should have fully delineated the nature and extent of explosives and chlorinated solvent contamination in the groundwater at the Site.  General Dynamics states that the findings and conclusions of the OU2 RI are set forth in the Revised Draft Final Remedial Investigation Report Operable Unit No. 2, which is a document that speaks for itself.  General Dynamics admits that the groundwater plumes associated with Load Lines 1 and 4 contain explosives and TCE.  General Dynamics denies that the groundwater plumes associated with Load Lines 2 and 3 are contaminated almost exclusively with explosives; although not identified during USACE's RI, USACE has belatedly now confirmed that the groundwater at and in the vicinity of Load Lines 2 and 3 also is impacted by TCE.  General Dynamics denies the remaining allegations in Paragraph 24.

25.   General Dynamics admits the allegations in Paragraph 25.

26.   General Dynamics admits the allegations in Paragraph 26.

27.   General Dynamics lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 27, and therefore denies the same.

28.   General Dynamics is not required to respond to Paragraph 28 because it asserts legal conclusions, not factual allegations.   To the extent that Paragraph 28 contains factual allegations, General Dynamics denies those allegations.

29.   General Dynamics is not required to respond to Paragraph 29 because it asserts legal conclusions, not factual allegations. To the extent that Paragraph 29 contains factual allegations, General Dynamics denies those allegations.

30.   General Dynamics is not required to respond to Paragraph 30 because it asserts legal conclusions, not factual allegations.  However, General Dynamics does not dispute that the Site is a "facility" within the meaning of Section 101(9) of CERCLA.

31.   General Dynamics is not required to respond to Paragraph 31 because it asserts legal conclusions, not factual allegations.  However, General Dynamics does not dispute that TCE is a hazardous substance as that term is defined at Section 101(14) of CERCLA and 40 C.F.R. Part 302.4.

32.   General Dynamics is not required to respond to Paragraph 32 because it asserts legal conclusions, not factual allegations.  However, General Dynamics does not dispute that there has been a release of hazardous substances at the Site within the meaning of Sections 101(14) and 101(22) of CERCLA.

33.   General Dynamics is not required to respond to Paragraph 33 because it asserts legal conclusions, not factual allegations.   To the extent that Paragraph 33 includes factual

allegations, General Dynamics lacks knowledge or information sufficient to admit or deny these allegations, and therefore denies the same.

34.    With respect to the first and third sentences in Paragraph 34, General Dynamics lacks knowledge or information sufficient to admit or deny the allegations, and therefore denies the same.  With respect to the second sentence in Paragraph 34, General Dynamics is not required to respond because it asserts legal conclusions, not factual allegations.   To the extent that the second sentence in Paragraph 34 includes factual allegations, General Dynamics denies those allegations.

35.    In response to Paragraph 35, General Dynamics reasserts its responses to Paragraphs 1–34.

36.    With respect to the allegation that from approximately 1959 to 1964, the Army granted the Air Force permission to construct and operate an Atlas missile facility at the Site, General Dynamics lacks knowledge or information sufficient to admit or deny these allegations and therefore denies the same.  General Dynamics admits that General Dynamics, pursuant to a contract with the Government, installed Ground Support Equipment and Ground Operating Equipment at the AMA for three Atlas "D" series missiles.  General Dynamics also admits that pursuant to a contract with the Government, General Dynamics demonstrated the operational status of each of the Atlas D missiles at the AMA prior to acceptance of each missile by the Air Force. The Government required General Dynamics and Dow to use TCE, pursuant to Government prescribed specifications and processes, to meet the Government's stringent cleaning requirements. Title to any TCE used by General Dynamics and Dow to clean the Atlas missiles and components passed to and vested in the Government upon delivery of the TCE to the Site.   General Dynamics denies the remaining allegations in Paragraph 36.

37.    With respect to the last sentence of Paragraph 37, General Dynamics admits that TCE is a "hazardous substance" pursuant to Section 101(14) of CERCLA.  General Dynamics incorporates by reference its response to Paragraph 36.  General Dynamics denies the remaining allegations in Paragraph 37.

38.    General Dynamics is not required to respond to Paragraph 38 because it asserts legal conclusions, not factual allegations.  To the extent that Paragraph 38 contains factual allegations, General Dynamics denies those allegations.

39.    In response to Paragraph 39, General Dynamics reasserts its responses to Paragraphs 1–38.

40.    General Dynamics is not required to respond to Paragraph 40 because it asserts legal conclusions, not factual allegations.  To the extent that Paragraph 40 contains factual allegations, General Dynamics denies those allegations.

41.    General Dynamics is not required to respond to Paragraph 41 because it asserts legal conclusions, not factual allegations.  To the extent that Paragraph 41 contains factual allegations, General Dynamics denies those allegations.

42.    General Dynamics admits that it has not reimbursed the United States for costs incurred by the United States in responding to the release of hazardous substances at the Site. General Dynamics lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 42, and therefore denies the same.

43.    In response to Paragraph 43, General Dynamics reasserts its responses to Paragraphs 1–38.

44.     General Dynamics is not required to respond to Paragraph 44 because it asserts legal conclusions, not factual allegations.   To the extent that Paragraph 44 contains factual allegations, General Dynamics denies those allegations.

The statements in Paragraphs A–C of the Complaint's Prayer for Relief are not allegations of fact, and therefore no response is required.   To the extent a response is required, General Dynamics denies the allegations, including without limitation that the Government is entitled to any of the relief requested.

45.     General Dynamics generally denies each and every allegation of the Complaint, with the exception of those allegations specifically admitted in this Answer, or that constitute an admission against the interest of the Government.   General Dynamics' general denial extends to any assertion contained within the headers of the Complaint to the extent that it constitutes an affirmative allegation.

## **AFFIRMATIVE DEFENSES**

General Dynamics asserts the following affirmative defenses:

1.     The United States has failed to state a claim upon which relief can be granted.

2.     The United States cannot recover response costs from General Dynamics because the Government promised that it would broadly and comprehensively release and hold General Dynamics' former division Convair harmless from any liability for damage at and around NOP, including damage to "Government Property" and to third-party property.   "A Government contractor may be absolved of liability for a CERCLA cleanup if its contract with the Government includes a clause holding it harmless." *United States v. ConocoPhillips Co.*, 2012 WL 4645616, at *5 (W.D. Tex. Sept. 30, 2012).   General Dynamics must be held harmless from any CERCLA

response costs the United States incurs remediating NOP, and General Dynamics is entitled to recoupment to the extent the United States recovers such costs from General Dynamics.

3.      To the extent CERCLA abrogates General Dynamics' right to be held harmless from any liability for damage at or around NOP, CERLCA takes contract rights that pre-date its enactment in violation of the Takings and Due Process Clauses of the Fifth Amendment.

4.      To the extent that any alleged contamination at NOP attributable to Convair is divisible from other contamination at or in the facility, General Dynamics is not liable for costs relating to that other contamination.

5.      The United States' claims are barred in whole or part by the statute of limitations.

6.      The United States' claims are barred insofar as the Government seeks to recover costs, damages, and expenses that were incurred in a manner that is inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP") as required by CERCLA, 42 U.S.C. §§ 9605, 9607(a)(4)(A)–(B) and 40 C.F.R. § 300, *et seq.*, including because the United States failed to take reasonable steps to mitigate its damages and substantially delayed clean-up at the Site.

7.      The United States' claims are barred in whole or in part under the Fifth Amendment's Due Process Clause because General Dynamics was not provided with contemporaneous notice of the United States' alleged activities at the Site or an opportunity to participate in the development of the administrative record.

8.      Any recoverable necessary response costs must be allocated in accordance with those factors recognized under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), and other equitable considerations.

12

9.      Because the United States is a CERCLA potentially responsible party, it may not seek to impose joint and several liability pursuant to CERCLA Section 107, 42 U.S.C. § 9607, against General Dynamics.  To the extent, if any, that the United States incurs or has incurred necessary responses costs, it may only seek such costs pursuant to CERCLA Section 113, 42 U.S.C. § 9613.

10.     General Dynamics incorporates by reference all applicable defenses set forth in the answer of any other Defendant.

11.     General Dynamics reserves the right to assert additional affirmative defenses after it conducts discovery in this matter.

## GENERAL DYNAMICS' COUNTERCLAIM

For its counterclaim, General Dynamics alleges:

1.      This case concerns the United States' attempt to impose environmental liability in violation of its solemn promises to the contactors whom the Government induced to assist in the campaign to protect the Nation during the Cold War.

2.      At the dawn of the nuclear age, the United States faced an existential threat. Intercontinental ballistic missiles ("ICBMs") could, in minutes, deliver untold destruction across the globe.  But the United States perceived the Union of Soviet Socialist Republics (the "Soviet Union" or "USSR") to hold a technological advantage.  And until the United States caught up, it was vulnerable to a preemptive nuclear strike.  So, in 1955, President Eisenhower assigned the United States' ICBM program—the "Atlas Weapons System"—the "highest priority" and ordered that development proceed "without tolerating any…delays."

3.      To accomplish that mission, the United States entered into contracts with private contractors that contained a simple bargain.  The contractors would carry out the United States'

priorities and follow its directions.  The United States, in turn, would hold the contractors harmless from potential liabilities resulting from the contractors' actions.

4.      Repeatedly, the contracts embedded the United States' promise to protect the contractors that agreed to jump into this dangerous, fast-paced, and mission-critical program.  First, a "Government Property" clause specified that the contractors "shall not be liable for any loss of or damage to…Government Property, or for expenses incidental to such loss or damage."  Second, a "Liabilities for Facilities" clause provided that the contractors "shall not be liable for any loss of or damage to the industrial facilities" they used, "or for expenses incidental to such loss or damage."  Third, a "Liabilities to Third Persons" clause provided that contractors would "be reimbursed[] . . . for liabilities to third persons for loss of or damage to property" arising from their work.

5.      One of the contractors who accepted this bargain was Convair, a former division of Counterclaimant General Dynamics, which worked on the Atlas Program at the former Nebraska Ordnance Plant ("NOP" or "Site") in Saunders County, Nebraska.  Convair stepped up and did exactly what the United States required.  Thanks in part to those efforts, the United States obtained a fully functional Atlas Weapon System and was able to hold the Soviet Union at bay.

6.      Decades after Convair's work ended, the United States discovered that NOP's soil and groundwater had been contaminated with explosives and the solvent trichloroethylene ("TCE").  The United States alleges that this contamination was caused by releases of these hazardous substances during historic military operations conducted at NOP, including, in part, by operations associated with the Atlas Weapons System.  And the United States has brought suit, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §9601 *et seq.*, ("CERLCA"), seeking to impose on General Dynamics part of what the

14

United States now estimates will be approximately $185 million to remediate TCE environmental impacts directly resulting from the historic military operations at NOP.

7.     The United States brings suit notwithstanding its clear contractual promises to hold its contractors harmless.  Moreover, the United States brings suit notwithstanding that it is ultimately responsible for the TCE contamination at NOP.

8.     Indeed, the United States used and released substantial amounts of TCE at NOP during World War II ("WWII"), during the Korean Conflict, when installing the Atlas Weapons System facilities and infrastructure, when operating the Atlas Weapons System, and when decommissioning NOP.

9.     The United States does not allege that Convair released TCE at NOP during any of these periods.

10.    To the extent Convair used TCE at the site during its brief stint there, it did so only under the direction and supervision of the United States, using facilities that were designed by the United States to release the TCE directly into the environment.

11.    General Dynamics thus asserts a counterclaim against the United States seeking allocation of all NOP CERCLA response costs to the United States pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f).

## THE PARTIES

12.    Counterclaimant General Dynamics is a corporation organized in the state of Delaware whose principal place of business is Reston, Virginia.  Convair was a division of General Dynamics at the time it contracted with the United States to work on the Atlas Program.

15

13.     Counterdefendant is the United States of America, as well as the United States Air Force (the "Air Force"), the United States Army (the "Army"), and the United States Army Corps of Engineers (the "USACE"), as federal agencies of the United States.

14.     Co-Defendant Dow is a corporation organized in the State of Delaware whose principal place of business is Midland, Michigan.  Dow Industrial Services, Inc. was a subsidiary of Dow and supported the critical work commissioned by the Government at NOP.

### JURISDICTION AND VENUE

15.     This Court has jurisdiction over General Dynamics' CERCLA counterclaim under 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331.

16.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 9613(b) because the alleged release and claimed damages at issue occurred within this District, the United States brought suit in this district, and the United States may be found in this district.

17.     The United States has waived its sovereign immunity from CERCLA suits.  42 U.S.C. § 9620(a)(1).

### FACTUAL ALLEGATIONS

18.     Convair performed its work at NOP under the threat of nuclear war.  As detailed below, the United States promised Convair that by agreeing to perform this critical but dangerous work on behalf of the Nation, it could do so without fear of liability.

19.     Moreover, even absent that promise, the United States bears ultimate responsibility for the TCE contamination at NOP because, in addition to using and disposing of TCE, the Government also directed and controlled the use and disposal of TCE by other entities at NOP. For example:

a.  the United States disposed of TCE into the environment at NOP long before Convair was present at NOP;

b.  the United States directed and controlled the activities of other contractors at NOP, which resulted in the release of TCE into the environment both before and during the period of time that Convair was present at NOP;

c.  the United States designed and constructed the NOP Atlas facilities, and thereby determined how and where TCE would be released;

d.  the United States directed and controlled Convair's NOP activities, including its use of TCE;

e.  the United States continued to use TCE at NOP after Convair's activities ceased;

f.  and the United States failed to comply with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), incurring millions of dollars in unnecessary cleanup costs.

## I.   THE GOVERNMENT PROMISED THAT CONVAIR WOULD NOT BE LIABLE FOR DAMAGE OR LOSS AT NOP.

20.   Convair's activities at NOP were performed under exigent circumstances. Convair agreed to help as part of the United States' "concurrency" strategy, which required simultaneous development and construction of the Atlas Weapons System. In exchange for agreeing to participate in this ambitious effort, Convair secured promises from the Government that the Government would bear all risk for all liabilities associated with the development of the Atlas Weapons System.

### A.   The Soviet Nuclear Threat

21.   At the beginning of the Cold War, the United States faced an existential threat: it perceived that the USSR had developed a significant strategic advantage in its ability to deliver

17

nuclear warheads in a conflict with the United States.

22.    In 1950, the National Security Council ("NSC") warned that within four years, the USSR would "attain the capability of seriously damaging vital centers of the United States, provided . . . that the blow is opposed by no more effective opposition than [the United States] now ha[s] programmed."

23.    The NSC thus proposed a massive nuclear build-up and recognition "that the cold war is in fact a real war in which the survival of the free world is at stake."

24.    The United States heeded the NSC's advice and directed the Air Force to bring the United States' own ICBM system—the Atlas Weapon System—online.  The paramount goal was achieving the earliest possible attainment of an initial operational capacity.

25.    In 1955, President Eisenhower assigned the Atlas Program the "highest priority" of the United States.   President Eisenhower ordered that development be advanced "without tolerating any of the delays which may attend normal development or procurement programs."

26.    The urgency of the ICBM project grew as the decade progressed.  Just days after the Soviet Union launched a second Sputnik vehicle on November 3, 1957, the U.S. Government recommended a major expansion of the ICBM program—from 80 to 600 missiles.

27.    Similarly, a Central Intelligence Agency National Intelligence Assessment issued on November 12, 1957 concluded that the USSR could have 500 operational ICBMs by the end of 1962, while the United States would have only 65 Atlas missiles by 1961—unless the United States acted quickly to expand the ICBM program.

28.    In 1958, President Eisenhower reiterated that the ICBM program was to have "highest priority above all others for research and development and for achieving operational capability."

29.     Unsurprisingly, the Government's Atlas plans put little, if any, priority on preventing releases of chemicals into the environment.

**B.     The "Concurrency" Strategy and the Essential Role of Government Contractors**

30.     To develop the Atlas Weapon System as rapidly as possible, the Air Force adopted a development strategy known as "concurrency": design, research, testing, construction, and training of the Atlas Weapons System all proceeded at the same time.

31.     Concurrency differs from the typical approach to developing military weapons systems.   Under the typical approach, development occurs in a step-wise, sequential fashion. Design, testing, and similar prefatory steps occur first.   Only after those prefatory steps are complete does significant construction and implementation commence.

32.     Under the concurrency approach, the Atlas Weapons System continued to undergo design and development modifications even during the construction of Atlas launch sites and installation of missiles at strategic locations throughout the United States, including at NOP.

33.     Concurrency carries a well-known tradeoff.   It reduces development time but increases costs (and the risk of things going wrong).   Developing systems in parallel often requires scrapping or repeating work, including work that imposes environmental costs.

34.     The Air Force chose concurrency because only concurrency could achieve the United States' goal of ensuring the Atlas Weapon System's operational status as quickly as possible to deter the nuclear threat posed by the Soviet Union.   As Major General Osmund J. Ritland, Commanding Officer of the Air Force Ballistic Missile Division, explained in 1961, concurrency "was adopted as the *only* way to reconcile national security requirements with the inexorable hands of the clock."

19

35.    Due to the complexity, the urgency, and the unprecedented scope of the Atlas project, the Government found that it had to enlist government contractors at a never-before-seen scale.

36.    The Government concluded that no one government contractor possessed the across-the-board competence and personnel needed to perform the complex systems engineering required.  Only an expansive array of defense contractors would provide a broad industrial base, ensure ultimate control by the Government's Air Material Command as the administrator of the contracts, and attract the nation's best scientists to the project.

37.    The Air Force thus contracted with the Ramo-Wooldridge Corporation ("Ramo-Woolridge") to provide overarching systems engineering and technical support for the entire Atlas program, while enlisting thousands of additional contractors to handle various parts of the project.

38.    By the late 1950s, the Air Force and Ramo-Wooldridge supervised over 150 first-line contracts, and the Atlas project employed roughly 2,000 contractors with more than 40,000 personnel.

39.    One of those contractors was General Dynamics and its Convair division.  Among other things, the Air Force contracted with General Dynamics to manufacture the Atlas missile airframe and integrate into that airframe various missile components and parts, including the Atlas rocket engines.  This work was performed at Convair's facilities in San Diego, California.  The Atlas rocket engines were designed and manufactured by another Air Force Contractor, North American Aviation's Rocketdyne Division ("Rocketdyne"), as discussed further below.

**C.    The Government's Comprehensive Promises to Bear All Risk for All Liabilities Associated with the Development of the Atlas Weapons System**

40.    Defense contractors like Convair were essential to the Atlas project, yet they received only a relatively small, defined profit margin in exchange for their critical efforts.  What

20

they received instead of a larger profit margin was a promise: in return for the contractors' agreement to meet the nation's most urgent needs, the United States would bear the entirety of the substantial risks presented by the development and deployment of the Atlas Weapon System.

41.     This arrangement was executed via the cost-plus-fixed-fee ("CPFF") contract, a prominent type of "cost-reimbursement" contract.

42.     The CPFF contract guaranteed government contractors that the government would reimburse the contractor for all allowable costs incurred during performance, plus a relatively small, defined profit in the form of a "fixed fee."  Congress capped the fee available for research and development CPFF contracts at 15 percent, *see* 10 U.S.C. 2306(d) (1958); 32 C.F.R 3.404-4(c) (1960), yet Convair received less than 7 percent fee under its primary CPFF contract for the Atlas program—less than half of the permissible margin rate.

43.     In exchange for that relatively modest profit, CPFF contracts shifted the risk of contingencies to the United States under standard hold-harmless provisions.  Such provisions reflected the Government's decision to self-insure government-owned property, believing that such an approach would ultimately reduce the cost of the contractor's services.

44.     As relevant here, the Government promised in multiple, overlapping ways that it, and not the contractor, would bear the risk of all harms, including environmental damage, arising from the Atlas project, including work at NOP.  These clauses were prescribed by regulation or statute, and were required terms in Convair's contracts.

  a.   ***No liability for harm to Government Property and related costs***.  One such provision is the "Government Property" clause, which allocates to the Government the risk of loss or damage to government property made available to the contractor under the procurement contract.  *See* 32 C.F.R. § 13.503 (1954); 32 C.F.R. § 13.503

21

(1960); 32 C.F.R. § 13.503(f)(i) (1965).  The clause provides that "[t]he Contractor shall not be liable for any loss of or damage to the Government Property, or for expenses incidental to such loss or damage."  32 C.F.R. § 13.503(f)(i) (1960). "Government Property," encompasses "all property owned by or leased to the Government," including "lands" and "interests therein."  *Id.* § 1013.101-64; 32 C.F.R. § 13.101-2 (1955).

b. ***No liability for harm to Government Facilities and related costs***.  For projects the size of the Atlas project, the contractor also had the protection of an overlapping "Liabilities for Facilities" clause, which states the Contractor "shall not be liable for any loss of or damage to the industrial facilities, or for expenses incidental to such loss or damage." 32 C.F.R. § 13.411(a) (1955).

c. ***No liability for harm to third parties***.  Convair's work at NOP was subject to yet another protective provision requiring that the "Contractor shall be reimbursed[] . . . for liabilities to third persons for loss of or damage to property" arising from its work under the contract. *Id.* § 7.203-22.[1]

45.      Together, these clauses, and others, ensured that the United States bore the risk of any loss stemming from Convair's Atlas activities at NOP.  That was the bargain struck almost 70 years ago during a time of immense security threat to the United States, and on which the Government has now reneged, long after Convair helped mitigate the threat.  That bargain is

---

[1] General Dynamics in this action does not seek indemnification from the Government.  Indeed, General Dynamics has no liability to indemnify.  The indemnification clause, however, reinforces that the parties used every available tool to ensure that Convair would not bear the risk of loss for damage to property.

enforceable, and the Government has breached its obligations to the extent it recovers costs that it promised that Convair and its successor, General Dynamics, would not bear.

## II.      THE GOVERNMENT MANDATED AND CONTROLLED THE USE OF TCE AT NOP.

46.      In addition to promising that Convair would not be liable for damage or loss stemming from the Atlas project, the Government bore ultimate responsibility for the use and release of TCE at NOP: it directed and supervised Convair's TCE use (in addition to the activities of other Government contractors at NOP), and also itself released a substantial amount of TCE at NOP over the two-plus decades that NOP served as a military site.

## A.      The NOP Site

47.      The TCE contamination at NOP is primarily concentrated in just four areas.  This is no accident.  Rather, it is the product of the Government's activities at specific areas of NOP over the course of roughly two decades.  An understanding of the geographic layout at NOP is thus key to understanding the Government's ultimate responsibility for the contamination at NOP.

48.      The following map depicts the layout of the facilities at NOP:



49.     NOP consists of 17,250 acres located in Saunders County, Nebraska.

50.     NOP contains four former ordnance bomb loading lines (known as "Load Lines" 1 through 4, or "LL1" through "LL4"), a bomb booster assembly area, a booster demolition area, an ammonium nitrate plant, burning grounds, a landfill, a sewage treatment plant, and various support buildings.  As depicted in the map, LL1 through LL4 were arranged in rows spreading across the middle of the Site (with LL1 being the farthest west and LL4 being the farthest east).  As elaborated on below, the TCE contamination at NOP is concentrated primarily around these four Load Lines. LL1 and LL4 are associated with the greatest amounts of TCE contamination.

51.     Two other aspects of NOP's geographic layout are important to understanding the concentration of TCE at NOP.  The first is the Atlas Missile Area ("AMA"), consisting of three Atlas missile launch pads (also referred to as AMA Launch Buildings) and a launch control facility

24

(also referred to as the AMA Control Building). As the map shows, these were located to the north of LL4 at NOP. As detailed below, the AMA is where the bulk of Atlas missile activities occurred.

52.     In addition, there was an Atlas cleaning facility (also referred to as the Former Butler Building). This facility was located at the northern end of LL1 at NOP, as depicted on the map.

**B.     The Government's Use of TCE at NOP during WWII**

53.     The use of TCE at NOP was the result of over twenty years of activities supporting United States' combat and defense efforts throughout the mid-twentieth century. These efforts began during the WWII era.

54.     In 1941, nearly two decades before Convair first stepped foot onto NOP, the United States constructed an ordnance manufacturing plant—*i.e.*, NOP—near Offutt AFB to support the WWII effort. The Government's WWII activities at NOP required the use of TCE.

55.     The first industrial operations at NOP were the four bomb Load Lines, beginning with the activation of LL1 in October 1942.

56.     From 1942 to 1945, the United States—through its contractor, the Nebraska Defense Corporation—produced almost three million bombs and other ordnance at NOP.

57.     TCE is a chlorinated solvent that has numerous industrial uses, including being used (i) to clean and degrease metal parts and equipment and (ii) as a paint thinner or remover. As part of bomb production, NOP conducted ancillary industrial operations including washing, cleaning, preparing, painting, storing, and shipping bombs. These ancillary industrial operations at NOP required the use of TCE.

58.     For example, a NOP-specific ordnance training manual prepared by the United States in 1942 specifically acknowledges the presence of a TCE degreasing tank at NOP and

25

provides specific health and safety instructions regarding the use of TCE at NOP.  *See* Nebraska Defense Corporation, "Inspectors Training Manual, Bomb Loading-Explosives, Boosters, Bomb Fuzes & Safety, Nebraska Ordnance Plant, Fremont-Nebraska," subtitled "Ordnance Department Training Manual," 1942, at 193 (specifically referencing the use of TCE for vapor degreasing at NOP).

59.     LL1, in particular, contained key areas where TCE would have been used, such as a bomb rework room that included a soaking tank for cleaning and a "Receiving & Painting" building that contained several paint stripping tanks.  These structures correspond closely to the highest concentrations of TCE found today in groundwater at LL1.

**C.     The Decommissioning of NOP's WWII Operations**

60.     The use of TCE at NOP continued after the end of the war.  TCE was also used extensively during the decommissioning of NOP's WWII operations.

61.     Ordnance manufacturing operations at NOP initially ceased on November 28, 1945, and the Site was placed into "standby status."

62.     In preparation for standby status, the ordnance manufacturing operations were decommissioned and all inert components were cleaned, checked, and moved from production lines to storage areas.  In addition, NOP received large quantities of components and parts from other Government facilities for preservation and storage.

63.     Relevant military standards in place at the time required all this equipment to be dismantled, cleaned, and placed in "deep freeze."  These activities occurred, at least in part, at LL1.

64.     Critically, for the large-scale cleaning necessary to prepare machinery to be placed into "deep freeze," vapor degreasing was recommended.  Vapor degreasing was to be done with

TCE.  *See e.g.* War Department Technical Manual ("TM") 9-850, Cleaning, Preserving Sealing, and Related Materials Issued for Ordnance Material (August 1944).

**D.      The Government's Use of TCE at NOP during the Korean Conflict and Subsequent NOP Decommissioning**

65.     Little time passed before the Government resumed using TCE at NOP.  This time, it did so as part of the Korean Conflict.

66.     In 1951, the United States reactivated NOP to support the Conflict.  Like the WWII effort before, this effort involved substantial use of TCE.

67.     Because of the exigency of the Korean Conflict, the United States had to bring NOP's ordnance manufacturing operations back online with great haste.  This included the United States removing (and disposing of) the preservatives that had been placed on the ordnance equipment following WWII.

68.     United States War Department military standards at the time recommended the use of solvents, including specifically TCE, to remove those preservatives.  *See e.g.* TM 9-850, Cleaning, Preserving Sealing, and Related Materials (June 1947).

69.     Inspection reports from the era demonstrate that dip tanks containing solvents were used to clean parts, and instruction manuals for the various dip tanks contemplated use of solvents that likely included—and in at least one instance, expressly included—TCE.  One manual, for instance, directed that cleaning occur using a vapor cleaning compound that was added to water for use in steam cleaning.  Another—for the "TM 9-850"—explicitly called for use of a "compound [that] contain[ed] trichloroethylene [TCE]."  Dept. of Army Technical Manual, TM 9-850, Abrasive, Cleaning, Preserving, Sealing, Adhesive, and Related Materials Issued for Ordnance Material (Oct. 1951), at paragraph 58.

70.     Throughout the Korean Conflict, the United States utilized NOP to manufacture more than 200,000 general purpose bombs, as well as over 16 million howitzer shells and rockets.

71.     The Government's use of TCE that occurred at NOP during WWII resumed during the Korean Conflict.

72.     Further Government use of TCE during the Korean Conflict increased even beyond WWII levels.

73.     For example, during the Korean Conflict, the United States adapted LL1 to load multiple types of new bombs—including tritonal bombs and Nike missiles—that required additional levels of cleanliness to ensure safe production.

74.     Correspondence from the time period notes that implementation of the Nike missile loading operations at LL1 required updated "facilities for cleaning tools and equipment," and "[r]enovat[ion] and condition[ing] [of] motors, gear boxes, shafts, [and other items]."  The Government has explicitly acknowledged that the Nike missile operations conducted at LL1 involved the use of TCE.  *See, e.g.,* Correspondence Re: "Program and Estimated Cost of Tools, Equipment and Provision of Cleaning Facilities, Necessary for the Manufacture of T-26, T-37 and T-28 Warheads, Schedule Item OAC-69, on Load Line One," Apr. 8, 1955.

75.     After the Korean Conflict ended, in late 1956, the United States placed NOP on standby status and once again cleaned and preserved the machinery.

76.     Like at the end of WWII, the Government used TCE at NOP to degrease and clean the equipment prior to it being placed into "deep freeze."  Military standards from the time again recommended the use of vapor degreasing for these cleaning operations.  *See, e.g.*, TM 9-1007, Materials Used for Cleaning Preserving Abrading and Cementing Ordnance Materials (November 1956).

28

77.     In 1959, the United States operated a Nike missile maintenance facility located to the north of LL1.  The United States used TCE at this Nike missile maintenance facility.

78.     Again, all of this occurred before Convair set foot at NOP.

79.     The United States is responsible for releases of hazardous substances resulting from its own activities or those of its contractors occurring prior to the time that Convair commenced its critical work at NOP.

**E.     The Development and Design of Atlas Weapons System in Response to the Cold War Threat and the Essential Role of Cleanliness**

80.     Again, the pause on TCE use at NOP proved temporary.  Even as the United States placed NOP on standby status, it began developing the Atlas Weapons System that would be deployed at NOP.  Critically, in developing the Atlas Weapons System, the Government adopted a propulsion system that required an extraordinary level of cleanliness.  And to achieve that extraordinary level of cleanliness, the Government would again turn to TCE.

81.     As discussed above, the United States rushed to develop the Atlas Weapons System at the fastest possible speed in response to USSR's perceived nuclear superiority.

82.     Critically, as the United States proceeded to develop the Atlas Weapons System, the United States contracted with Rocketdyne for the design and manufacture of the rocket engines that would be used to power the Atlas D missiles.

83.     The Rocketdyne engines utilized a highly refined form of kerosene known as "RP-1" as fuel.  The RP-1 was combined with an oxidizer—liquid oxygen ("LOx")—in the combustion chamber to produce the thrust necessary to launch the Atlas D missile.

84.     The Government's decision to select the Rocketdyne engines that required the use of LOx as an oxidizer significantly contributed to the TCE contamination at the Atlas sites.

29

85.     LOx presented a significant hazard.  If LOx encountered hydrocarbons, there was a risk of explosion that could destroy the Atlas Weapon System.  Thus, all equipment employed in handling and utilizing LOx had to be scrupulously cleaned to avoid explosive reactions.  The degree of cleanliness required was often referred to as "LOx Clean."

86.     Indeed, cleanliness was paramount: "All portions of the Propellant Loading System and its component parts [had to] be absolutely cleansed of all foreign particles and hydrocarbon larger than 150 microns as the presence of foreign substances, particularly hydrocarbons, [could] result in violent explosion and void the function of [a] facility."  *Report to the Congress of the United States; Findings Resulting from Initial Review of the Ballistic Missile Programs of the Department of the Air Force*, Comptroller General, Dec. 1960, at 24.

87.     That explosion risk was real; during the Atlas missile era, it resulted in the destruction of at least four Atlas missiles from liquid oxygen related causes during fueling exercises.

88.     This "surgical cleanliness" was also extraordinarily difficult to accomplish.  It was described as a "super cleanliness . . . not previously encountered by the Corps of Engineers nor the American manufacturing and construction industries" and as "unprecedented quality control and cleanliness standards . . . [that] threatened the capabilities of science and industry." *History of Propellant Systems Division August 1960-April 1962*, U.S. Army Corps of Engineers Ballistic Missile Construction Office (CEBMCO), at Foreword, 6.

89.     TCE was key to achieving the "surgical cleanliness" that LOx demanded.  But achieving this surgical cleanliness required the use of TCE in novel and untested ways, without delay.

**F.     The Design and Construction of ICBM Facilities at NOP**

90.     At the same time the Government developed and designed the Atlas Missile Systems, it designed and constructed the facilities at NOP that would house and support the Atlas missiles.  The Government's design of the Atlas missile launch pads ensured that TCE would be directed away from the Atlas missile itself and into the into the soil and groundwater at and around NOP.

91.     The United States chose Offutt Air Force Base ("Offutt AFB") to service three Atlas launch sites, one of which would be NOP.  As a result, almost as soon as NOP was put on standby following the Korean Conflict, it was called into service again.

92.     At NOP, the Air Force selected 1,185 acres north of LL4 to serve as launch sites— what became known as the AMA —and another 34 acres to the north of LL1 to occupy as the Air Force Technical Area.

93.     With a site selected, the Air Force proceeded to design the Atlas missile infrastructure at NOP, while the construction and installation of the infrastructure fell to USACE and its contractors (not affiliated with Convair or General Dynamics).

94.     Convair had no responsibility for the site selection, construction, or installation of the Atlas missile infrastructure at NOP.

95.     The site infrastructure included the launch services buildings, from which missiles would actually be launched.  The launch services buildings were designed to include a "flame bucket," or blast deflector, consisting of a concrete ramp and trench that deflected the blast from the missile during launch.  A typical Atlas D flame bucket is depicted in the following photograph:



96.     Importantly, the flame bucket also served as a conduit for flushing TCE and other chemicals when the missiles were cleaned.  The flame bucket's concrete pad and trench connected to ditches that discharged into Johnson Creek.  Thus, USACE designed the flame bucket to direct TCE releases from the flame bucket into the drainage ditches and then ultimately into Johnson Creek.

97.     As construction and installation of the Atlas infrastructure rapidly moved forward, USACE used substantial amounts of TCE to complete the project on the condensed timetable, as explained below.

98.     USACE was also responsible for installation of the fueling system—known as the propellant loading system ("PLS")—and associated propellant storage tanks.

99.     As noted above, the PLS needed to be chemically clean and free of all foreign matter (LOx Clean).  USACE's specifications mandated that the PLS be flushed with TCE in order to demonstrate that the system was LOx Clean.

100.    However, the PLS utilized by the Atlas Weapon System was plagued by issues.  In particular, the skids containing the PLS proved to be a frequent problem—one that had to be addressed in part by using even more TCE.

101.    The PLS was designed by A.D. Little and manufactured by Winger Construction Company, Inc.—both entities were United States contractors.  The PLS system was mounted into a production skid at the manufacturing plant for transportation to NOP where it was to be installed by an USACE contractor.

102.    Upon leaving Winger's manufacturing plant, the PLS was supposed to be LOx clean.  However, once these PLS arrived at NOP and numerous other Atlas D missile sites around the country, it was discovered that the PLS were not LOx clean as required to mitigate the risk of a catastrophic explosion.

103.    In all such instances, contractors retained by USACE had to disassemble and reclean the PLS in the field, requiring USACE to develop new field cleaning procedures.

104.    These procedures expressly required "circulating warm trichloroethylene through the [PLS] piping system for 20 to 30 minutes," followed by draining the used TCE out of the system.  U.S. Army Corps Memo, "Procedures for Cleaning Propellant Transfer System in Place for Atlas Missiles," Nov. 29, 1960.

105.    This process was sometimes repeated multiple times until the USACE contractor (not affiliated with Convair or General Dynamics) was able to demonstrate that the PLS skids were LOx Clean.

106.    As a result of the Government's concurrency approach, the PLS had to undergo design changes throughout USACE's installation of the system at NOP.  The Air Force documented more than 60 contract modifications that needed to be made to the PLS at NOP.  Many

33

involved changes to the piping and other system components that required the PLS be re-cleaned to ensure that the components passed the cleanliness requirements.

107.   This re-cleaning required USACE and its contractors to use TCE.

108.   USACE's struggles with the PLS continued for years.  It was not until November 1960 that USACE was finally able to complete validation of the Atlas fueling systems at NOP.

109.   All these activities took place without Convair's involvement.

**G.   The Government's Direction and Supervision of Convair's NOP Activities**

110.   The Government's involvement in the NOP Atlas missile activities remained pervasive after Convair's arrival; the Government directed and supervised Convair's NOP activities.

111.   While the Government continued to struggle to clean the PLS, in or about January 1960, Convair personnel began to arrive at NOP to commence Convair's assigned NOP duties, including installation of the Ground Support Equipment ("GSE") and Ground Operating Equipment ("GOE") at the AMA.

112.   These activities occurred under the close supervision and direction of the Government.  Convair's operations at NOP were "highly controlled" by the Government.  Robert M. Howard & Shawn T. Cobb, *Victory Through Production: Are Legacy Costs of War Scuttling the 'GOCO' Model?*, 46 Pub. Cont. L.J. 259, 279 (2017).  The Government prescribed the specifications and processes that applied to Convair's work, including those governing use of TCE to clean Atlas missiles and components.  Moreover, Convair personnel reported directly to the Air Force personnel, who in turn monitored Convair's activities to ensure Convair's compliance with the Government's requirements.

113.    For example, the Air Force required that Convair and other contractors demonstrate for the Air Force the operational status of each Atlas system prior to the Air Force's "acceptance" of the missile.

114.    To demonstrate operational status, Convair had to, *inter alia*, successfully complete a "dual propellant loading" exercise ("DPL"), which required that the Atlas D missile countdown be initiated and that the missile be erected and fueled.

115.    Following a successful DPL, the fuel would be drained from the missile fuel tank, and the rocket engines would be flushed with TCE utilizing an automated solvent service unit.

116.    Convair neither designed the relevant solvent service unit nor developed the unit's flushing procedures.  The solvent service unit was an internal system that was supplied by government contractor Rocketdyne (which was not affiliated with Convair or General Dynamics).

117.    Because of how it was designed and built by Rocketdyne, the solvent service unit would automatically pump hundreds of gallons of TCE through each of two booster engines and the sustainer engine, resulting in TCE being discharged from the engines and falling into the flame bucket.

118.    Once in the Air Force-designed and USACE-constructed flame bucket, the TCE flowed out into the exhaust channel (designed by USACE) and into a drainage ditch (designed by USACE) that then ultimately discharged into Johnson Creek.

119.    The Air Force required Convair to conduct three successful DPLs on each missile before the Air Force would accept the missile.

**H.    The Government's Continued Use of TCE at NOP after Convair Completed its Work**

120.    Once Convair demonstrated the operational status of each of the Atlas D missiles, the Air Force took full operational control over each missile.

35

121.    During the operational period, the Air Force conducted DPLs (which, as explained, required the use of TCE) in connection with routine training, readiness tests and inspections, shakedowns, and system updates.   In addition, the Air Force used TCE during maintenance whenever work needed to be done on the PLS and its associated equipment.

122.    For example, the Air Force conducted routine training exercises involving DPLs, at a minimum, once every 90 or 180 days.

123.    In addition, the Air Force periodically conducted "P1" and "P2" inspections of the missiles.  P2 inspections, in particular, required moving a missile to Offutt AFB.

124.    Removal of a missile—even temporarily—required replacement with a spare missile from "Ready Storage" at Offutt AFB.

125.    Each time a removed missile was returned to a launcher following inspection, and each time a "Ready Storage" missile was used to temporarily replace a missile, a DPL was performed by the Air Force.

126.    In May 1962, the Site Activation Task Force for the Offutt Squadron reported that "[a] total of one hundred four (104) DPL's ha[d] been accomplished," spread among the nine Atlas launch pads associated with Offutt Air Force Base, including the three launch pads at NOP.

127.    Finally, in 1963, the Air Force began conducting Operational Readiness Inspections ("ORIs") of missile units, which included additional DPL exercises performed by the Air Force.

128.    Initially, due to inadequate familiarity of the Air Force crews with the equipment and a reluctance on the part of Strategic Air Command to remove warheads from missiles on emergency war order status, which was necessary to conduct DPLs, ORIs were replaced by "shakedowns" where at least two consecutive successful DPLs were conducted.

129.    For either ORIs or shakedowns, "the heart of the inspection" was the DPL.

36

130.    For Atlas D missiles, the success rate during ORIs in 1963 was only 44 percent. When an Atlas missile failed an ORI, it had to be conducted again which would have required another DPL performed by the Air Force.

131.    The necessity of accomplishing consecutive successful DPLs with such a low success rate expanded the number of DPLs required beyond simply the number of ORIs or shakedowns performed.

132.    Again, each of the DPLs by the Air Force required that the engines be flushed with hundreds of gallons of TCE.

I.    **The Government's Decommissioning of NOP's ICBM Activities**

133.    Even when the ICBM missile activities at NOP ceased, the Government's use of TCE at NOP continued for one final period—when the Government decommissioned NOP's Atlas launch facility.

134.    NOP remained an operational ICBM base until October 1, 1964, when the last Atlas D missile at NOP was taken off alert and the Air Force began to demobilize the Site.

135.    Upon commencement of deactivation, the Air Force Logistics Command or General Services Administration removed and disposed of fuels, gasses, solvents, and other chemicals.

136.    This necessarily included removal and disposal of TCE from the three solvent service units that remained part of each of the three launch pads at NOP.

137.    The Government subsequently divested the AMA to the Nebraska National Guard. The Government divested the remainder of NOP to the University of Nebraska, the Nebraska National Guard, and assorted individuals and private corporations.

**J.      The TCE Contamination at NOP**

138.    As a result of the Government's two decades of activities at NOP, NOP is contaminated with TCE.  As alluded to above, that TCE is concentrated in four areas associated with the NOP Load Lines.  Only one of those locations has a geographic connection to Convair's activities at NOP, and the geographic dispersion of TCE at that location is a direct result of the Government's design of the Atlas missile facilities.

139.    Environmental investigations at NOP have identified TCE contamination at the Site.

140.    The contamination is concentrated into four plumes, one for each Load Line.  The plumes are depicted in this map:



141.    Convair's NOP activities were limited to the AMA to the north of LL4 and the northern end of LL1.

142.    Environmental investigations have found TCE comingled with explosives contamination in groundwater at each of the four ordnance Load Lines.  This comingling shows that TCE was released into the environment during the ordnance operations that long predated Convair's NOP activities.

143.    Further, TCE appears in load lines with no connection to the Atlas operations at any point.

144.    The LL1 TCE plume, for example, is centered in the bomb production area at concentrations of a magnitude found nowhere else at NOP.

145.    Although USACE initially reported that there was no TCE in groundwater at LL2 and LL3, subsequent investigations conducted by USACE long after the site remedy was approved and implemented finally discovered TCE in groundwater at LL2 and LL3.  There is no evidence of any Atlas-related operations or activities at these load lines.

146.    The only plume demonstrated to have any physical proximity to the AMA where Convair operated is the LL4 plume.

147.    To the extent the LL4 plume may have resulted in part from Convair's NOP activities, the Air Force's site selection and design of the flame bucket are responsible for TCE migration from the AMA.  The Air Force's site location and design decisions caused TCE to be discharged into Johnson Creek, from which the TCE migrated in a southeasterly direction and became one of at least three separate TCE sources contributing to the LL4 TCE plume.

**K.      The Government's Deficient Investigation and Remediation at NOP**

148.     In addition to being responsible for the TCE contamination at NOP, the Government is responsible for the deficient investigation and remediation of that contamination. These failures, in turn, resulted in implementation of a remedy inconsistent with the requirements of the NCP and resulted in untold millions of dollars of unnecessary remediation costs.

149.     In 1980, Congress enacted CERCLA.  CERCLA establishes a comprehensive liability framework for the investigation and cleanup of sites containing hazardous waste.

150.     CERCLA can impose liability for the costs of cleaning up hazardous substances on the arrangers and transporters of the hazardous substances, as well as on the current and former owners and operators of facilities where hazardous substances were disposed.

151.     These arrangers, transporters, and current and former facilities owners and operators are referred to as "CERCLA-liable parties."

152.     A party—including the Government—that incurs costs that are necessary to investigate or remediate hazardous substance may seek to recover such costs from CERCLA-liable parties, but the party—again, including the Government—must do so in a manner consistent with the National Contingency Plan.  42 U.S.C. § 9607(a).

153.     Roughly two decades after the last military operations at NOP, USACE began investigating environmental contamination at NOP and identified TCE and explosives contamination in soil and groundwater at the Site.

154.     Despite commencing these investigations in the mid-1980s, USACE's investigation of the Site remains ongoing almost 40 years later—due to USACE's many missteps.

155.     In 1991, USACE and the United States Environmental Protection Agency ("U.S. EPA") entered into Federal Facilities Agreement VII-91-028 (the "FFA"), which obligated

40

USACE to complete all necessary investigation and remediation activities to fully address the identified environmental contamination at NOP.

156.    Pursuant to the FFA, the cleanup of NOP was divided into five operable units ("OUs").  "OU-1" and "OU-2" are most relevant to this case.  "OU-1" focused on contaminated soil at each of the four load lines.  "OU-2" focused on groundwater and soil contamination not otherwise addressed by OU-1.

157.    From the start, USACE relied on a flawed conceptual site model ("CSM") that erroneously assumed that TCE was only associated with the Atlas missile operations.

158.    USACE's reliance on its flawed CSM resulted in USACE's failure to (i) fully delineate the TCE groundwater plumes and (ii) identify TCE sources prior to selection and implementation of the OU-2 groundwater remedy.  Both deficiencies continue to the present date.

159.    To begin, USACE's original OU-2 remedial investigation concluded that TCE was present in groundwater only at LL1 and LL4.  It took USACE more than 13 years after the OU-2 remedy was underway for USACE to find TCE in the groundwater at LL2, and an additional 7 years to find TCE in groundwater at LL3.

160.    Moreover, USACE dramatically underestimated the LL1 TCE plume.  After the OU-2 remedy was well underway, USACE discovered that the LL1 plume was more than two-and-a-half times the length and more than twenty-five times the concentration that USACE had initially identified.

161.    These were unforced errors caused by the Government's refusal to seriously consider that TCE contamination stemmed from any source other than Atlas Missile operations.

162.    Indeed, General Dynamics repeatedly recommended that USACE look for TCE at all four of the load lines, given that TCE was used to support the ordnance operations.  Although

the nature and extent of the LL2 and LL3 plumes have yet to be fully delineated, it is now clear that there are TCE plumes at all four load lines, largely in the same alignment and with the same evident sources.

163.    USACE, however, proceeded forward in disregard of General Dynamics' input and of evidence that demonstrated the folly of USACE's approach.

164.    For example, even at the early stages of the Site's investigation history, USACE ignored evidence of solvent use associated with the ordnance operations.  A 1983 Archive Search Report identified the likely historic use of solvents in the ordnance plant.  Nevertheless, USACE made little effort to undertake any comprehensive investigation to identify potential solvent releases at each of the four load lines.

165.    TCE has now been found at multiple locations having no association with the Atlas missile operations.  However, rather than recalibrate its CSM, USACE continues to cling to the pre-conceived and incorrect view that the Atlas missile operations are the sole source of the TCE impacts at the Site.

166.    On September 29, 2006, General Dynamics and Dow entered into an Administrative Settlement Agreement and Order on Consent for Investigation to further evaluate potential remedial technologies that had not previously been evaluated by the Government.  Both General Dynamics and Dow incurred necessary costs of response to evaluate these alternative remedial technologies intended to enhance USACE's ongoing remedial activities at the Site.

167.    Notably, it is not just General Dynamics that has criticized USACE's site investigation efforts.  In 2018, USACE brought in a "Tiger Team" from its Environmental and Munitions Center of Expertise to assess USACE's efforts at the Site.

168.    The Tiger Team made a number of recommendations, including that USACE needed to undertake further source characterization to identify the sources of TCE contamination at Load Lines 1 and 4.

169.    Only in 2020, two years after the Tiger Team issued its recommendations, did USACE finally begin to focus on source identification at LL1 and LL4.   Even this new investigation has refused to question the assumption that the only source of TCE was the Atlas missile operations.

170.    USACE's failure to fully delineate the nature, extent, and source of the TCE plumes resulted in the selection of a remedy that was not effective and not technically achievable in a reasonable period of time.

171.    For instance, USACE's very late discovery of the LL2 and LL3 TCE plumes and of the true scope of the LL1 plume should have caused USACE to re-examine its selected treatment approach.  In fact, that was precisely the recommendation of USACE's Tiger Team.

172.    Instead, USACE continues to implement an extremely expensive and ineffective remedy that was predicated on an incomplete investigation and reliance on a flawed CSM.

173.    These actions resulted in the United States implementing a remedy that was inconsistent with the requirements of the NCP and that has resulted in untold millions of dollars of unnecessary remediation costs.

**L.    The Government's Suit**

174.    Despite using TCE at NOP long before Convair arrived, despite designing and constructing the NOP facilities and directing and supervising Convair's NOP activities, and despite promising to hold Convair harmless, the Government now seeks to hold General Dynamics liable for the TCE contamination at NOP.

43

175.    On September 23, 2023, in this lawsuit, the United States sued General Dynamics under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

176.    The United States alleges that there were releases of hazardous substances (namely, TCE) at the NOP site while Convair worked for the United States.

177.    The United States further alleges that USACE has incurred at least $125 million in unreimbursed response costs in connection with the OU2 groundwater TCE contamination.

178.    The United States alleges that General Dynamics is liable for response costs incurred by the United States.

**COUNTERCLAIM:**
**CONTRIBUTION BASED ON THE GOVERNMENT'S**
**LIABILITY PURSUANT TO CERCLA § 113**

179.    General Dynamics realleges and incorporates by reference Paragraphs 1 through 178 as if fully set forth herein.

180.    A party that is potentially liable under CERCLA may seek contribution from any other party that is potentially liable under CERCLA.  42 U.S.C. § 9613(f)(1).

181.    Courts resolve such contribution claims by "allocat[ing] response costs among liable parties using such equitable factors as the court determines are appropriate."  *Id.*

182.    The United States has brought this action against General Dynamics under Section 107 of CERCLA seeking to recover from General Dynamics response costs allegedly incurred by USACE at NOP.

183.    Although General Dynamics denies that the United States is entitled to judgment, the United States is liable under Section 107 of CERCLA because the Government is a "person" within the meaning of Section 101(H)(21) and the Government (a) owned the land, improvements, buildings, equipment, machinery, materials, waste products, and other facilities at NOP at the time

44

when TCE was allegedly disposed or otherwise released at the site; (b) operated the NOP site directly and, to the extent Convair is alleged to have operated the NOP site, alongside Convair in the nature of a joint venture, by managing, directing, and otherwise controlling all work performed at the site, including work specifically related to the acquisition, storage, use, handling, and disposal of TCE; and (c) arranged for the treatment and disposal of TCE at the site by contract and agreement.

184.   Even if, notwithstanding Convair's contracts absolving it of liability and notwithstanding General Dynamics' other defenses, General Dynamics could be held potentially liable under Section 107 of CERCLA, General Dynamics is entitled to contribution from the United States.

185.   Under the United States' contracts with Convair, the United States agreed to hold Convair harmless for damages to government property and facilities and for expenses incidental to such damage.  It further promised to indemnify Convair for damage to the property of third parties.

186.   Given the United States' contracts with Convair, the CERCLA equitable factors require allocating to the United States responsibility for all CERCLA response costs for NOP.  *E.g.*, *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 299 F.3d 1019 (9th Cir. 2002) (affirming 100 percent allocation of CERCLA costs to the United States based on contractual hold-harmless provision).  The United States' contracts with Convair eliminate the need for any further equitable inquiry.

187.   Even if further equitable inquiry were necessary, equitable considerations here also support allocating to the United States responsibility for all CERCLA response costs at NOP.  The Government disposed of TCE at NOP during WWII and the Korean Conflict—long before Convair

began its operations.  The Government disposed of additional TCE while building the Atlas facilities at NOP, which the Government designed in a manner that resulted in the direct release of TCE into the environment.  The Government directed and supervised Convair's use of TCE at NOP and required Convair to utilize the Government's equipment, materials, and facilities.  The Government continued to dispose of TCE at NOP after the Air Force took over full operation of the Site, including during the decommissioning of the Atlas Missile System.  And the Government's investigation and remediation of the environmental contamination at NOP was inconsistent with the NCP.

188.    At bottom, the ICBM program was a "war effort," and the Government acted—and government contractors like Convair heeded the Government's call—in an "atmosphere of stark determination for victory at all costs."  *Shell Oil Co. v. United States*, 751 F.3d 1282, 1284 (Fed. Cir. 2014).  The Government cast aside any consideration (including, understandably, how solvents would be disposed of) other than preservation of the United States in the face of the Soviet threat.  History has vindicated that choice.  But the Government cannot now impose the costs of that choice on the contractors who served the Nation when they were needed most.

189.    Therefore, in the event General Dynamics is found to have any liability, General Dynamics seeks allocation to the United States under the CERCLA Section 113 equitable factors of all CERCLA response costs incurred and to be incurred by the parties at NOP.

## PRAYER FOR RELIEF

WHEREFORE, to the extent allocation of costs is necessary, General Dynamics requests judgment against the United States, and that this Court:

    A.      Allocate to the United States pursuant to the CERCLA Section 113 equitable factors, responsibility for all of the CERCLA response costs incurred and to be incurred by the parties at NOP;

    B.      Award court costs to General Dynamics; and

    C.      Award General Dynamics any other and further relief to which it is entitled.

Dated this 17th day of November, 2023.

GENERAL DYNAMICS
CORPORATION, Defendant,

By:  /s/ Steven D. Davidson
      Steven D. Davidson (NE# 18684)
      Lindsay K. Lundholm (NE# 22224)
      Brian Barmettler (NE#27017)
of   BAIRD HOLM LLP
      1700 Farnam Street, Suite 1500
      Omaha, NE  68102-2068
      Phone: 402-344-0500
      Email:  sdavidson@bairdholm.com
      Email:  llundholm@bairdholm.com
      Email:  bbarmettler@bairdholm.com

and

      Wade A. Thomson
      Steven M. Siros
of   JENNER & BLOCK LLP
      353 N. Clark St.
      Chicago, IL  60654
      (312) 222-9350
      Email:  wthomson@jenner.com
      Email:  ssiros@jenner.com

      Matthew S. Hellman
of   JENNER & BLOCK LLP
      1099 New York Avenue, N.W.
      Suite 900, Washington, DC 20001-4412
      (202) 639-6861
      Email:  mhellman@jenner.com

47

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of November, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Charles W. Fletcher, III
Frederick S. Phillips

/s/Steven D. Davidson

6206114.2