**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff and Counter-Defendant,<br><br>v.<br><br>GENERAL DYNAMICS CORPORATION<br><br>and<br><br>DOW CHEMICAL COMPANY,<br><br>Defendants and Counterclaimants. | ) | CIVIL ACTION NO. 8:23-CV-00416 |

**GENERAL DYNAMICS CORPORATION'S**
**<u>BRIEF IN SUPPORT OF ITS MOTION FOR DISCOVERY SANCTIONS</u>**

In its Order dated April 29, 2026, the Court warned the Government that sanctions including dismissal would be considered if either of two events occurred: first, if the Government failed to complete its disclosure of classified documents by July 15, 2026; or second, if the Government produced an unusually large number of documents as purported supplemental discovery responses after the same deadline. (*See* ECF No. 689 at 22.) Both events have now occurred. Dismissal or other appropriate sanctions should be imposed as the Court indicated.

Merely a month after the Government represented to the Court, in July 2026, that it had finally completed its production of declassified documents (*see* ECF No. 716 at 1), the Government reported to Defendants and the Court (*see* ECF No. 766 at 1) that it failed to "collect, review, or produce" any documents from the Defense Technical Information Center ("DTIC"), a highly relevant Government repository which houses significant amounts of both classified and non-classified documents, despite the fact that the Government had previously (and repeatedly)

represented to Defendants that it would produce responsive documents housed in that location. In subsequent meet and confers, the Government confirmed that the DTIC search terms it agreed to in 2024 resulted in *hundreds of thousands of unique hits* or more across DTIC documents that the Government never reviewed or produced as promised.

As of the date of this Motion, and despite repeated inquiries from Defendants, the Government has failed to provide Defendants with a potential timeline for complete review and production of the DTIC documents, classified documents included, meaning it could take many months or years for production to be "complete" (again). But the last time Defendants propounded requests for production and reminded the Government of its discovery obligations to review and produce responsive classified documents, at the start of fact discovery in this case, it took the Government *two and a half years* to represent it had complied. Worse, after years of delay, the Government ultimately produced merely 250 declassified documents, only half the volume of DTIC classified documents that hit on a narrowed subset of key search terms unilaterally selected by the Government.

Even more remarkably, just this week (and nearly seven weeks after the Government's July 15 production deadline), the Government reported to Defendants and the Court that it also failed to review and produce relevant documents that hit on the parties' agreed search terms at yet another significant repository it had previously promised to produce from, specifically the National Archives and Records Administration ("NARA"), a multi-location Government archive where some of the most probative documents so far produced in this action were housed. (ECF No. 788-2 at 1.) As with the DTIC documents, the Government repeatedly represented to Defendants in 2024 that it would run the agreed search terms to identify responsive documents at NARA, which it also agreed to produce. As it turns out, the Government never did what it promised at NARA or

DTIC. Despite its misrepresentations, and in line with the Government's pattern of flouting its discovery obligations, the Government also unilaterally declared it will not "conduct any further review or production from NARA"—and is thus endeavoring to deprive Defendants of documents to which they are entitled and which the Government previously promised to produce. (*Id.* at 2.)

Enough is enough. The Parties cannot continue to stop and start this case each time the Government discloses yet another production failure. The Government's previous deficiencies already caused Defendants to re-open discovery and supplement expert reports, all in anticipation of a trial setting delayed by six months. Repeating this process yet again is incredibly prejudicial to GD and should not be permitted. Thus, GD respectfully asserts that the Court should sanction the Government for its egregious discovery conduct by dismissing this case. In the alternative, the Court should at least impose lesser sanctions under Federal Rule of Civil Procedure 37(b)(2)(ii), specifically by imposing adverse inferences, which would allow the trial to proceed as scheduled in 2027 without having to wait—potentially for years—for production of the outstanding documents.

## FACTUAL BACKGROUND

### A. This Court held in April 2026 that the Government had repeatedly and willfully failed to meet its discovery obligations, and that continued failure would be grounds for dismissal.

On April 29, 2026, this Court issued a Memorandum and Order in which it detailed the Government's failure to abide by its responsibilities to produce declassified documents, rescheduled trial from September 2026 to March 2027, and set a final declassified document production deadline of July 15, 2026. (ECF No. 689.) GD does not repeat the full factual background leading up to that Order here, but emphasizes the Court's findings that:

- "The initial deadline for production was December 23, 2024. This was continued several times, with the latest deadline on October 10, 2025. The government missed all these deadlines." (*Id.* at 2.)

- "Plaintiff cannot plausibly claim that it was unaware of classified documents or the importance of discovery of those documents to Defendants. . . . For example, in 2019, the team that was investigating pertinent records prior to the filing of this lawsuit identified classified records related to the Atlas Missile project and notified the Department of Justice of the presence of those documents." (*Id.* at 17.)

- "[T]his Court believes that the failure to produce the documents in this case has been willful. The Court believes that the United States certainly has had the capacity to produce the documents it is required to produce, but the United States simply has chosen not to assign the appropriate priority and staff to get the job done." (*Id.* at 21–22.)

- "If this Court goes along with the United States' excuses and refusal or purported inability to follow court deadlines, the undersigned has little doubt that this case would be hanging around the undersigned's docket for five, ten, or fifteen years." (*Id.* at 3.)

- "[A]n undue delay before trial is unacceptable to the Court and the parties." (*Id.* at 9.)

- "[T]he court is unconvinced by Plaintiff's arguments that the documents so far declassified have not produced any startling new revelations . . . ." (*Id.* at 18.)

- "[T]his case is likely to be dismissed if the United States does not follow this Court's orders and produce the documents in question by July 15, 2026." (*Id.* at 3.)

- "Plaintiff must bear in mind that failure to meet the Court's July 15, 2026 deadline to complete disclosure of declassified documents or producing an unusually large number of documents as purported 'supplemental' discovery responses after the deadline would warrant a re-evaluation of whether and what sanctions should be imposed for discovery failings." (*Id.* at 22.)

**B. The Government failed to meet the July 15, 2026 deadline to produce responsive declassified documents.**

Despite the Court's repeated warnings in its April 29, 2026 order that failure to meet the July 15, 2026 deadline for production of classified documents would likely warrant dismissal of the case (*see* ECF No. 689 at 3), the Government nevertheless failed to meet its deadline—and in spectacular fashion—because it failed to review or produce *any* declassified documents held at DTIC by that deadline.

The DTIC issue was foreshadowed by a series of additional Government discovery failures and misconduct. On July 7, 2026, the Government represented to the Court that it had completed its production of declassified documents. (ECF No. 716 at 1.) Promptly thereafter, on July 10,

2026, GD asked the Government to obtain sworn affidavits from the agencies that conducted the declassification review and production to confirm that production was complete. (*See* ECF No. 749-3 at 1–2.) Despite the fact that the Government had previously obtained sworn affidavits in support of its prior bid to *avoid* producing classified documents (*see* ECF No. 487 at 2 n.2), the Government refused GD's request. (*See* ECF No. 749-3 at 1–2.)

As discussed below, the Government also made multiple productions of "supplemental" documents leading up to the July 15, 2026 deadline, including a production of over 15,000 pages from a "FUDS-DOCS" database (FUDS means "Formerly Used Defense Sites"). (ECF No. 749-29.) Only after Defendants pressed the Government for additional information related to that late production did the Government purportedly realize that it failed to produce documents held at DTIC. (ECF No. 766-1 at 1.)

On August 14, 2026, the Government sent a letter to Defendants, and simultaneously filed that letter with the Court, in which the Government disclosed that it had failed to collect, review, and produce numerous documents housed at DTIC in Fort Belvoir, Virginia. (ECF No. 766 at 1.) DTIC is a Department of War repository for scientific and technical information, a category highly relevant to the technical issues raised in this case. The DTIC repository includes both public and non-public documents, including approximately 230,000 classified documents. (Ex. 1, Aug. 18, 2026 email from J. Franzen, at 6.) [1] The Government disclosed in its letter that it failed to produce DTIC documents that hit on previously agreed-upon search terms—search terms that the Government itself had written in large part (*see* Ex. 2, June 10, 2024 Ltr. from F. Phillips to W. Thomson, at 2–3)—including classified and other non-public documents. (ECF No. 766-1 at 1.)

[1] All exhibits cited herein are filed as exhibits to the Declaration of Steven D. Davidson filed concurrently herewith.

The Government had only produced two non-classified DTIC documents that GD had requested by name, but it had otherwise reviewed and produced *no documents* from DTIC. (*Id.* at 3.)

Contrary to how discovery normally works, GD has been forced to constantly tell the Government where to look for responsive documents. Indeed, it was GD that told the Government in January 2024 (before the Government agreed to the original discovery deadline in this case) that the Government would need to prepare to produce a substantial amount of classified documents and even provided locations for the Government to search. (ECF No. 532-2.) Unfortunately, this trend continued with the DTIC documents and continues today. Specifically, while not obligated to inform the Government of what locations it should search for its own documents, GD identified DTIC as a likely source of relevant documents early in this litigation, and specifically asked, *in May 2024*, that the Government review and produce responsive documents from the DTIC archives, including the classified sections. (Ex. 3, May 17, 2024 Ltr. from W. Thomson to F. Phillips, at 14.) In response, the Government promised to run the parties' agreed search terms through the public and non-public sections of the DTIC database, and to "produce any responsive documents, subject to any necessary declassification." (Ex. 4, Aug. 9, 2024 Ltr. from F. Phillips to W. Thomson, at 3.) After repeated GD efforts to obtain confirmation, the Government subsequently confirmed that it had run all of GD's requested search terms through the non-public, "restricted" side of the DTIC database in October 2024. (Ex. 5, Oct. 21, 2024 Ltr. from F. Phillips to W. Thomson, at 4.) GD had no reason to doubt these representations.[2]

[2] The Government's August 14, 2026 letter (ECF No. 766-1) also asked in desperation about the possibility that there may have been an agreement between one or more Defendants and the Government that the Government did not need to review and produce relevant documents housed at DTIC, but no such agreement ever existed. (*See* Ex. 1, Aug. 18, 2026 email from J. Franzen to S. Futernick, at 15–16.)

In meet and confers following the Government's August 14, 2026 letter, the Government revealed that it had, in fact, run the parties' agreed search terms over the DTIC documents in 2024, but had taken *no action* to conduct a responsiveness review, initiate declassification efforts, or produce any documents pursuant to those searches. (*See* Ex. 1, Aug. 18, 2026 email from J. Franzen to S. Futernick, at 17.) The search terms it ran in 2024 resulted in *hundreds of thousands of unique hits* or more on documents from the restricted side of the DTIC database.[3] (*See* Ex. 6, Aug. 17, 2026 email from J. Franzen to J. Moten, at 11–22.) The Government further explained that while the restricted side of the database includes classified documents that have unclassified titles or abstracts, classified documents that have *classified* titles or abstracts are only searchable through the classified portion of the database by those with the necessary clearance, and the Government had not yet even run search terms over that portion of the database. (*See* Ex. 1, Aug. 18, 2026 email from J. Franzen to S. Futernick, at 5.)

Accordingly, despite repeated assertions that it would do so, the Government has now confirmed that it failed to review or produce *any* classified (or non-classified) documents from DTIC (other than the two GD specifically requested). (*See* ECF No. 788 at 1.) The Government makes this admission more than two years after it confirmed in writing that it would review the DTIC documents, more than a year and a half after the original close-of-discovery date, and a month after the Court's final deadline for production of declassified documents.

[3] The Government's searches resulted in hundreds of thousands of hits for some individual search terms, and hits in the millions when all individual search term hits are added together (although some search term hits are likely duplicates). (*See* Ex. 6, Aug. 17, 2026 email from J. Franzen to J. Moten, at 11–22.)

### C. The Government also failed to meet its deadline to produce non-classified documents.

#### 1. Non-Classified DTIC Documents

The Government's failure to review and produce relevant documents from the DTIC database does not only implicate classified documents, but it also implicates the second part of this Court's Order dated April 29, 2026, namely a Government production of an unusually large number of documents after the July 15 deadline. (*See* ECF No. 689 at 22.) The Government has represented to GD that the non-public and "restricted" sides of the DTIC database include *non-classified* documents that hit on relevant search terms, which the Government has not yet reviewed and produced as it promised to do in 2024.[4] (*See* Ex. 1, Aug. 18, 2026 email from J. Franzen, at 4 .) Based on the large number of hits on the parties' agreed search terms, supplemental, non-classified productions from DTIC are likely to be of significant volume, and as a result, production will likely take months—or even longer. The non-classified document production deadline was February 24, 2025. (ECF No. 228 at 1.) Accordingly, any non-classified DTIC production is *already* a year and a half late.

[4] The DTIC database also includes a "public" side, which the Government has suggested Defendants should search and review themselves. (*See* Ex. 4, Aug. 9, 2024 Ltr. from F. Phillips to W. Thomson, at 3.) But as GD has repeatedly explained, it is the Government's obligation to search for, review, and produce the responsive documents at issue, notwithstanding the fact that they may be stored in Government archives that may be accessed by other parties. *See, e.g.*, *Exxon Shipping Co. v. U.S. Dept. of Interior,* 34 F.3d 774, 776 n.4 (9th Cir. 1994) (noting that when the government is a party to litigation, "it is placed in the same position as a private litigant, and the rules of discovery in the Federal Rules of Civil Procedure apply."); *Hock Foods, Inc. v. William Blair & Co., L.L.C.*, No. 09-2588-KHV, 2011 WL 884446 at *8 (D. Kan. Mar. 11, 2011) ("The Federal Rules require a party to conduct a reasonable search for responsive information."); *City of Colton v. Am. Promotional Events, Inc.*, No. CV0906630PSGSSX, 2011 WL 13223968 at *3-4 (C.D. Cal. Nov. 28, 2011) (requiring Department of Defense to search and produce documents stored at the National Archives and Records Administration, which is accessible by third parties). Moreover, as noted above, the Government affirmatively agreed to undertake this review in 2024.

**2. Non-Classified NARA Documents**

On September 1, 2026, only a few days before the instant motion was to be filed (ECF No. 784), the Government disclosed yet another significant discovery failure: despite its explicit agreement to use the parties' agreed search terms to identify and produce responsive documents located at NARA, "the United States did not identify responsive documents from NARA's public, digitized collection using Defendants' requested search terms." (ECF No. 788-2 at 1.)[5]

Again, while not obligated to tell the Government where to look for responsive documents, GD specifically requested back in January 2024 that the Government review documents housed at three NARA locations: College Park, Maryland; Riverside, California; and Kansas City, Missouri. (ECF No. 532-2.) The Government agreed to do so, and as with the DTIC documents, *the Government repeatedly represented that it would run the agreed search terms at NARA and produce responsive documents accordingly*. Over many months, GD persistently requested additional information about the Government's search process at NARA, with the Government ultimately making the following key representations to GD:

1) On July 12, 2024, the Government confirmed with respect to all three NARA locations that it had searched "electronic databases using search terms." (Ex. 7, July 12, 2024 Ltr. from F. Phillips to W. Thomson, at 2.) On July 19, 2024, GD responded to the Government with specific questions regarding the Government's search process, including at the NARA locations, and asked the Government to complete a chart included in an appendix to the letter ("Appendix A Chart"). (Ex. 8, July 19, 2024 Ltr. from W. Thomson to F. Phillips, at 1–3, 10–13.)

2) On August 9, 2024, the Government wrote GD and clarified that with respect to the NARA locations, "[t]he search terms used to identify records are reflected on the attached Table 1 and were requested by GD." (Ex. 9, Aug. 9, 2024 Ltr. from F. Phillips to W. Thomson, at 2.) The Government further confirmed in a partially completed Appendix A Chart that it

[5] It is not currently clear to GD whether the classified documents stored at NARA were also keyword searchable and, if so, whether the Government used the parties' agreed search terms to identify responsive classified documents.

had run the parties' agreed search terms[6] against the digital database for all three NARA locations of interest. (*Id.* App'x A at 1.) In the "attached Table 1," the Government even provided *hit counts* for the search terms it had run at NARA, which show *tens of thousands of unique hits* at minimum.[7] (*Id*. at Table 1.)

3) On September 5, 2024, the Government re-affirmed that it had run the agreed search terms and represented that it would produce the responsive documents identified, writing: "We have run all of your requested search terms through [NARA and other indexes] to identify responsive documents, and *the documents we obtain from those locations have been, are being, and will be produced*." (Ex. 10, Sept. 5, 2024 Ltr. from F. Phillips to W. Thomson, at 1, 7 (emphasis added).) As part of the same letter, the Government provided a more complete version of the Appendix A Chart, reflecting that the government had run all of the parties' agreed search terms over all three NARA locations.

4) On September 24, 2024, the Government further re-iterated its agreement to use certain GD-requested search terms at NARA. (Ex. 11, Sept. 24, 2024 Ltr. from F. Phillips to W. Thomson, at 6.)

As with the Government's DTIC representations, Defendants had no reason to doubt the accuracy of any of the Government's statements.[8] Incredibly, despite the Government's misrepresentations and clear discovery failures regarding NARA, the Government now takes the brazen position that it does not "plan to conduct any further review or production from NARA." (ECF No. 788-2 at 2.) This is plainly improper, and it deprives Defendants of discovery to which they are entitled. To the extent the Government had any objection to reviewing and producing

[6] The set of agreed search terms reflects a combination of terms the Government devised per a June 10, 2024 letter and additional terms GD proposed in a June 18, 2024 letter. (Ex. 2, June 10, 2024 Ltr. from F. Phillips to W. Thomson, at 2–3; Ex. 12, June 18, 2024 Ltr. from W. Thomson to F. Phillips, at 7–8.)

[7] Some individual search terms garnered tens of thousands of hits. (Ex. 9, Aug. 9, 2024 Ltr. from F. Phillips to W. Thomson, at Table 1.) In total, there were 208,707 hits, although this number likely contains duplicates. (*Id.*) The Government also agreed to run additional ordnance-era search terms in September 2024 that are not included in Table 1. (Ex. 10, Sept. 5, 2024 Ltr. from F. Phillips to W. Thomson, at 5.)

[8] The Government asserts that "NARA's public, digitized records were also available to Defendants." (ECF No. 788 at 6.) But it was the Government's burden to search there. *See supra* at 8 n.4. And Defendants had no *reason* to search the NARA locations given the Government's clear and repeated representations that it was doing so.

documents responsive to the agreed search terms at NARA (or DTIC or any other agreed-to location), it waived those objections in 2024. *See, e.g.*, *StoreWorks Techs., Ltd. v. Aurus, Inc.*, No. 19-CV-1527(HB), 2020 WL 12442099, at *2 (D. Minn. Dec. 23, 2020) ("[C]ounsel for the parties represented to the Court that they had reached agreement on . . . the search terms that [defendant] would use to search for such documents. . . . The Court considers that agreement binding on the parties and counsel [and defendant] necessarily waived any objections based on relevance, burden, or proportionality.") Accordingly, if this action is not dismissed or the Government is not otherwise sanctioned, the Government must produce the outstanding NARA documents.

**3. Additional Failures**

In addition to the DTIC and NARA database failures, the Government has also belatedly produced non-classified documents from multiple other document sources—revealing that there may be even more serious discovery deficiencies at play here. On July 10, 2026, the Government made a surprise production of almost 15,000 pages of non-classified responsive documents, apparently located by accident "during project management work unrelated to this litigation." (ECF No. 749-29 at 1.) These documents were located in the FUDS-DOCS database—a repository that the Government agreed to search for responsive documents in 2024. (*See* Ex. 10, Sept. 5, 2024 Ltr. from F. Phillips to W. Thomson, at 2–5, 9.) Defendants have identified highly relevant documents in this production, including key Air Force manuals discussing the handling and use of trichloroethylene ("TCE") and various industrial hygiene procedures from the early 1960s applicable at NOP, which were clearly responsive to multiple Requests for Production served by Defendants.[9] (*See* ECF No. 747 at 16–18.) The Government's failure to identify clearly probative

[9] In addition, the FUDS-DOCS production further revealed the likely relevance of the unproduced documents held at DTIC. In its review of the FUDS-DOCS production, GD identified a highly

documents in its pre-suit investigation and prior collection efforts—from sources where the Government told Defendants it had already searched—is deeply troubling and indicates serious deficiencies in its overarching process for document collection, review, and production.

The Government also made supplemental non-classified document productions on June 29 and July 7, 2026, which collectively included over one hundred documents the Government contended were either responsive to Dow's May 29, 2026 Second Set of Document Requests or part of a "supplemental production of Technical Orders." (*See* Ex. 13, June 29, 2026 Production Ltr. from V. Moore; Ex. 14, July 7, 2026 Production Ltr. from J. Franzen.) But these productions included highly relevant documents—including applicable Government technical checklists calling for the use of TCE—that were undoubtedly responsive to Requests for Production Defendants had served over two years earlier, and therefore should have been timely disclosed. (*See* ECF No. 747 at 8–9.) In response to questions from GD, the Government explained that the documents had been located at two historical museums—the National Museum of the United States Air Force and the Cape Canaveral Space Force Museum—that it searched only in response to Dow's recent follow-on Requests for Production and had not otherwise searched. (*See* ECF No. 749-3 at 1.) Although the Government failed to search these historical libraries prior to the discovery deadline, it evidently knew that the libraries housed relevant documents, since it knew

relevant 1960 Rocketdyne Quarterly Program Progress Report that stated on its face that it was the "first in a series." (*See* Ex. 15, Aug. 7, 2026 email from S. Futernick to J. Franzen, at 1.) GD requested that the Government search for other such reports given that they are "squarely responsive to GD's discovery requests served over two years ago." (*Id.*) The Government ultimately agreed to search *DTIC* for those reports (Ex. 16, Aug. 25, 2026 email from J. Franzen to S. Futernick, at 1)—underscoring that DTIC is likely to house responsive and material information of the type GD identified in the FUDS-DOCS production. Of note, too, the Government has repeatedly claimed in this litigation that it lacks knowledge regarding Rocketdyne specifications despite the fact that responsive information, in the form of the Rocketdyne Quarterly Program Progress Reports, was at all times available at DTIC. (*See, e.g.*, Ex. 17, United States' Aug. 23, 2024 Responses to GD's First Set of Requests for Admission, Requests 117–118.)

to search those locations in response to Defendants' recent requests.[10] This is another clear indication that the Government failed to conduct a reasonable investigation into the locations of relevant documents prior to filing suit, during the initial fact discovery period, and in the year and a half since.

Finally, on August 14, 2026, the Government also produced 143 pages of Air Force regulations responsive to Dow's Third Set of Document Requests. (*See* Ex 18, Aug. 14, 2026 Production Ltr. from J. Franzen.) Those document requests sought specific non-classified Air Force regulations referenced in late-produced declassified documents—regulations clearly relevant to the case that Defendants learned about by happenstance upon reviewing belated declassified productions. (Ex. 19, Dow's July 15, 2026 Third Set of Document Requests.) These documents, like the documents uncovered at the National Museum of the United States Air Force and the Cape Canaveral Space Force Museum, were undoubtedly responsive to Requests for Production served by GD in 2024. (*See, e.g.*, Ex. 20, GD's Jan. 31, 2024 Request for Production No. 17 (requesting all documents relating to dual propellant loading procedures and/or exercises at NOP).) Defendants asked the Government where it had located the recently produced Air Force regulations, and the Government responded that they were found at Air University Library. (*See* Ex. 1, Aug. 18, 2026 email from J. Franzen, at 10.) The Air University is yet another location that the Government failed to previously search, despite the fact that it clearly housed information relevant to Defendant's discovery requests, and the Government understood as much in the context of its recent searches. Again, the Government's failure to search or even disclose a location

---

[10] The Government has yet to provide any reasonable explanation as to why it failed to search these document locations sooner.

containing clearly relevant documents indicates serious deficiencies in the Government's document search and production process.

In short, the Government is seriously deficient in its production of non-classified documents as well, and has both already produced and, if this case continues, will continue to produce "an unusually large number of documents as purported 'supplemental' discovery responses after the deadline"—conduct that this Court warned could result in serious sanctions. (*See* ECF No. 689 at 22.) And there are likely other relevant, unproduced documents in existence that would affect the parties' positions in this litigation, but GD has zero confidence, at this point, that the Government has located those documents. Moreover, the Government's failures call into question whether the Government had a good faith basis to bring its claims against GD in the first place. After all, how could the Government make allegations about the parties' historical operations if it never searched for, identified, or reviewed the documents that discuss the very activities at issue? As discussed below, the discovery to date sharpens the need to pose this question.

**D. The Government's discovery failures have revealed numerous untenable positions on the merits, demonstrating that the Government failed to conduct adequate searches and prejudiced Defendants.**

The Government's late-produced documents, including declassified documents, include information central to the case. As a result, the new documents have required the Government to abandon untenable merits positions it took early on, where the Government had seized on the purported unavailability of information to support its positions despite the fact that the information in question, it turns out, was in its possession the whole time. All of this casts serious doubt on the Government's allegations made to date in this litigation, as almost all Government contentions are based at least in part on historical records in its sole possession.

For example, one key set of issues in this action is: who disposed of TCE at NOP, when that disposal occurred, and according to whose orders/direction. (*See* ECF No. 13 ¶ 183.) TCE was generally used to flush and purge the Atlas missile engines after dual propellant loading exercises ("DPLs") at NOP, and GD alleges that the Air Force conducted certain DPLs at NOP without GD's involvement. (*Id.* ¶¶ 114–15, 121–22.) On May 30, 2024, GD served an interrogatory on the Government asking it to "[i]dentify the number of Dual Propellant Loading Exercises that were conducted by the Air Force at NOP, including the dates the Dual Propellant Loading Exercises were conducted." (Ex. 21, GD's May 30, 2024 Second Set of Interrogatories, Interrogatory No. 11.)

Initially, in response to GD's Interrogatory 11, the Government asserted that it did not have information that would enable it to say that the Air Force conducted any DPLs at NOP *at all*. (Ex. 22, United States's Oct. 2, 2024 Answers to GD's Second Set of Interrogatories, at 7.) The Government took this position throughout the fact discovery period and through the initial exchange of expert reports. However, recently produced *declassified* documents contained dates certain on which the Air Force had conducted dozens of DPLs without GD's involvement. At GD's insistence, the Government repeatedly and substantively amended its response to Interrogatory 11 three times as declassified documents trickled in, to acknowledge that it conducted specific DPLs. (*See* Ex. 23, United States's Amended Response to GD's Interrogatory No. 11, dated August 7, 2026; Ex. 24, United States's Amended Response to GD's Interrogatory No. 11, dated April 20, 2026; ECF No. 532-16 (dated May 21, 2025).) Additionally, the Government has amended its responses to various GD Requests for Admission on the same subject in light of recently produced documents. For example, where the Government initially claimed to lack information, it now acknowledges, based on recently produced documents, that the Air Force

did indeed conduct specific DPLs after GD left the site, and that the Air Force was required to use TCE at certain times at NOP. (*See* ECF No. 749-24, July 29, 2026 Amended Responses to GD's First Set of Requests for Admission, Nos. 114-116; Ex. 25, August 10, 2026 Amended Responses to GD's Fourth and Eighth Sets of Requests for Admission, Nos. 389, 480.)

If not for Defendants' insistence that the Government complete its declassified document productions, the Government might have been able to maintain to this Court its inaccurate position that it did not conduct any DPLs or use TCE at NOP independent from Defendants. Indeed, the Government used that now-debunked position successfully in the past in this very Court. In *Kirchmann v. United States*, the Kirchmann family sued the Government for contaminating NOP with TCE. *See* No. 8:CV91-00464, 1992 WL 551560, at *1 (D. Neb. Oct. 27, 1992), *aff'd*, 8 F.3d 1273 (8th Cir. 1993). The Government failed to produce the documents it has now produced in this litigation showing Government use of TCE at NOP, despite the fact that those documents were in its possession. It also submitted multiple declarations from NOP personnel that included nearly identical language to the effect that "routine maintenance of the missiles did not require Air Force employees to use TCE at the site"—which we now know, given the DPL exercises the Government was conducting per the declassified documents, is not true. (Ex. 26, Feb. 18, 1992 Decl. of Kerth ¶ 5; Ex. 27, Feb. 19, 1992 Decl. of Koehler ¶ 6; Ex. 28, Feb. 25, 1992 Decl. of Hatch ¶ 5; Ex. 29, Feb. 25, 1992 Decl. of Guttenfelder ¶ 5.) The court ultimately determined that "[t]he Air Force did not use TCE in operating the completed missile sites," and dismissed the case. *Kirchmann*, 1992 WL 551560, at *1, 3. We now know from declassified documents in this case that the Air Force clearly used TCE in operating NOP. The Government, in other words, was able to extract a favorable ruling in a prior case, despite the fact that contrary information was at all times in its possession. The Government has also not fully and fairly complied with its discovery obligations

in this matter, and as a result, Defendants may easily be prejudiced by unproduced documents in the same manner as what happened in *Kirchmann*.

Ultimately, because the recently produced documents have contained critical information, the Government has been forced to amend and/or abandon some litigation positions. It is highly likely that critical information housed at DTIC and NARA (or other places not yet fully or adequately searched) could cause the Government to change positions yet again, necessitating (again) follow-on discovery, expert work, and trial preparation efforts prejudicial to GD. More fundamentally, it is probable that unproduced documents undermine or contradict the Government's current litigation positions.

**E. The outstanding document productions would likely delay the case by years, if permitted.**

The Government's discovery failures have already pushed the discovery deadlines and delayed this case by a year and a half. If the Government is permitted to search for, declassify, and produce the outstanding DTIC and NARA documents, the case will likely be delayed by years. As noted above, the parties' agreed-upon search terms have resulted in hundreds of thousands of unique hits, and the search terms were not even run across all documents at DTIC because not all DTIC documents are full-text searchable, and some documents are not digitally searchable at all. (Ex. 1, Aug. 18, 2026 email from J. Franzen at 4–5.) Nor did the search terms hit upon the fully classified documents housed at DTIC. (*Id.*)

GD expects that production of the classified DTIC documents would be the biggest cause of delay. The last time GD asked the Government to review and produce classified documents, at the opening of the discovery period of this case in early 2024, it took the Government two and a half years to finally certify that its declassified productions were complete (ECF No. 716 at 1)—and, as we now know, even that certification was inaccurate.

Defendants have no reason to believe that the DTIC declassification process would proceed any more efficiently. Indeed, the Government has acknowledged that there would be no different process for declassifying these newly discovered documents. (Ex. 30, Aug. 21, 2026 email from B. Adkins to J. Moten at 4; ECF No. 788-1 ¶¶ 12-13.) Thus, once again, the Government has asserted it is unable to even provide an estimate as to how long production of its own declassified documents will take. (ECF No. 788 at 2 ("The United States cannot reasonably estimate when production will be complete because so many variables are indeterminate now."); ECF No. 788-1 ¶ 13 ("Uncertainty about the character of the classified documents . . . means that any attempt to set or predict a completion date at this time is little more than educated speculation."), ¶ 20 ("The classified document timeline is a Rumsfeldian known unknown at present.").) Without any estimate for completion, the Government has effectively made setting a new case progression schedule impossible.

With regard to the non-classified DTIC documents, production will also likely take a substantial period to complete. In addition to reviewing the many documents that hit upon the parties' agreed search terms, the Government would need to develop a process to review the documents that cannot be fully digitally searched. For example, the Government disclosed that "there is also a repository of approximately 200,000 records within DTIC that the United States was not aware of in 2024 that is not searchable electronically by any means, including keyword searches." (*See* Ex. 1, Aug. 18, 2026 email from J. Franzen, at 4; *see also* ECF No. 788-1 ¶¶ 4(c), 5.) The Government represented that these "unsearchable" records are technical military documents pre-dating 1953 and "may" include classified documents. (Ex. 1, Aug. 18, 2026 email from J. Franzen, at 6, 7.) Of note, the Government admitted that "it is possible there are ordnance era documents in the collection"—*i.e.*, documents which might be relevant to the Government's

use of TCE during World War II, the Korean Conflict, and the surrounding periods, another key issue in the case. (Ex. 30, Aug. 21, 2026 email from B. Adkins, at 3.) Further, significant numbers of *other* records in DTIC are not searchable in full—they may have, for example, only searchable abstracts and metadata. (*See* Ex. 1, Aug. 18, 2026 email from J. Franzen, at 6; ECF No. 788-1 ¶ 4(b).)

In an effort to—once again—shirk its discovery obligations, the Government has recently taken the position with regard to the DTIC documents that it does "not believe the United States' prior commitments to Defendants or its general discovery obligations would require additional searching of documents that are not searchable electronically (or documents that are not fully searchable electronically)." (Ex. 31, Aug. 26, 2026 Email from J. Franzen to J. Moten, at 4.) Rather, the Government proposes that it unilaterally narrow the parties' search terms—terms which the Government previously agreed to use in 2024—run those narrowed terms over only the portions of DTIC that are digitally searchable, and produce all non-classified documents hitting on those documents without review in a "pass through production," leaving Defendants with the burden to weed out irrelevant information.[11, 12] (*Id.*; ECF No. 788 at 4.) Indeed, the Government

[11] On September 1, 2026, the Government asked GD's counsel if it was interested in conferring with the United States on the unilaterally narrowed set of search terms it had run over DTIC. (Ex. 32, Sept. 1, 2026 B. Adkins Email to S. Futernick, at 1.) There is no basis for GD to revisit the search terms the parties carefully negotiated two years ago.

[12] Today, as GD was making its final preparations to file this motion, the Government produced more than 48,000 pages of public, digitized documents from DTIC as a partial pass-through production. (*See* Ex. 36, Sept. 4, 2026 Ltr. from J. Franzen to Counsel, at 1–2.) The Government does not seem to have done any responsiveness review or even confirmed the documents it produced were not duplicates of previously produced documents; instead, without looking at the underlying documents at all, the Government "conducted a limited review of document titles with metadata and culled from this production documents that did not appear likely to contain any information relevant to the case," putting the burden on Defendants to review the metadata of the excluded documents and affirmatively request any they do not believe should have been culled (or request all of them and agree to a full pass-through production). (*Id.*) This not only inappropriately

refuses to even entertain, or provide a timeline for, a plan in which the Government reviews the documents itself pursuant to the search terms to which it agreed, despite Defendants' explicit requests that it do so. (ECF No. 788 at 4.) Even pursuant to its improper, unilaterally narrowed search and pass-through production approach, the Government *still* cannot provide an estimate for when production of non-classified documents could be completed. (*See* ECF No. 788-1 ¶ 19.)

The Government's proposed approach would allow the Government to evade its obligations to perform the review work, and run the search terms, it agreed upon two years ago. It would also impermissibly shift the review burden to Defendants for no other reason than the Government's failure to live up to its discovery obligations. Most importantly, the Government's approach would allow the Government to completely avoid searching any documents that are not digitally searchable, even though the Government has admitted that unsearchable documents may contain information from relevant time periods.

Moreover, the Government has provided the parties with preliminary hit count information for its unilaterally narrowed set of search terms, and the narrowed search terms hit upon almost 500 searchable or partially searchable *classified* documents—a number which is likely to increase by up to ten percent. (Ex. 31, Aug. 26, 2026 Email from J. Franzen to J. Moten at 1–2; ECF No. 788-1 ¶ 9.) But thus far in this case, the Government has produced *less than 250* (albeit lengthy) *classified documents total*, and production of those classified documents took two and a half years. Review and production of nearly 500 (and likely more) classified documents at DTIC could accordingly be a very time-consuming proposition. By basic math, production of double the

saddles the Defendants with the burden to conduct a responsiveness and metadata review for no other reason than that the Government shirked its obligations to do its work back in 2024—it is also exactly the kind of "unusually large" supplemental production that this Court warned would warrant consideration of serious sanctions. (ECF No. 689 at 22.)

amount of classified documents produced thus far would, at the same pace, take double the production time—*five years*.

The Government has been unable or unwilling to provide any timeline for completion of a full responsiveness review of the DTIC documents, as it agreed to do in 2024. (*See* Ex. 33, Aug. 20, 2026 Ltr. from F. Dylewski to J. Franzen, at 2; ECF No. 788 at 4.) Nor can the Government commit to any deadline relating to the production of declassified documents from DTIC. (*Id.*; ECF No. 788 at 2; ECF No. 788-1 ¶¶ 13, 20.) Even if it could provide a timeline, Defendants would have cause for skepticism, given the number of classified document hits, and given that the Government has never yet met a document production deadline in this case.

Defendants are also entitled to a complete production of the NARA documents (as the Government previously agreed to do), despite the Government's newfound unwillingness to comply. It is unclear to Defendants how long review and production of the NARA documents would take (and the Government has provided no estimate), but given the fact that the search terms hit on tens of thousands of documents in 2024, it would also likely require a significant period to complete this production.

And then, once all documents were produced, the parties would require time to review and analyze the likely voluminous productions, serve additional written discovery and re-open impacted fact depositions, supplement expert reports and subsequently re-depose relevant experts, and otherwise prepare for trial given the new facts that would undoubtedly come to light—all of which effort could have been avoided if the Government had met its discovery obligations in the first place. The current case progression order allows nearly eight months for that work. (ECF No. 698 at 1.)

Accordingly, it is exceedingly likely that, should the Court allow the Government to make productions of the outstanding documents, the trial would be delayed, once again, for years.

## ARGUMENT

### I. The Court Should Dismiss the Government's Claims.

Dow's Second Motion for Relief from the Government's Discovery Failures, and its Supplement, explain in detail why the Government's repeated discovery failures warrant dismissal under Federal Rules of Civil Procedure 37(b) and 41(b), as well as pursuant to the Court's inherent authority. (ECF No. 747 at 23–30; ECF No. 781 at 3–5; 13–18; *see also* ECF No. 506 at 22–26.) GD incorporates but does not repeat those arguments.

GD notes, however, that in its April 2026 order, this Court explained that the Government's prior failures to timely produce documents had been "willful," and that the case was "likely to be dismissed" if the Government did not meet the Court's July 15, 2026 deadline for production of declassified documents. (ECF No. 689 at 3, 21.) Another occurrence, the Court explained, that would warrant consideration of discovery sanctions would be the Government "producing an unusually large number of documents as purported 'supplemental' discovery responses after the deadline." (*Id.* at 22.) Both events have now happened.

Defendants have already been prejudiced by the significant delay the Government's continued discovery failures have caused. The parties have been forced to engage in piecemeal and repetitive discovery and expert work as well as been subjected to an increasingly delayed trial on the merits, all of which has substantially increased costs for Defendants and unfairly prolonged resolution of the case. If this case were allowed to continue, that prejudice would only be compounded. The Court should sanction the Government by dismissing the case.

### II. If the Government's Claims Are Not Dismissed, the Court Should Impose Alternative Sanctions in Line with the Seriousness of the Government's Failure to

**Comply with Discovery Orders that Will Allow the Case to Promptly Proceed to Resolution.**

If the Court declines to dismiss the Government's claims, GD asks the Court to consider the following sanctions available to it under Fed. R. Civ. P. 37(b)(2), to apply both at summary judgment and the ultimate trial on the merits (if necessary): (1) impose an adverse inference that certain specific facts are taken as established; (2) preclude the Government from relying on a lack of evidence in support of its claims and defenses; and (3) impose an adverse inference that the unproduced documents are unfavorable to the Government's claims and defenses.

The Court has wide discretion under Fed. R. Civ. P. 37(b)(2) to fashion sanctions for the Government's failure to obey discovery orders, including, but not limited to: "(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; [or] (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]" *See also Insured Fin. Servs. v. State Farm Fire & Cas. Co.*, No. 8:18CV93, 2019 WL 13120564, at *1 (D. Neb. Nov. 14, 2019); *Stevenson v. Union Pac. R.R. Co*., 354 F.3d 739, 745 (8th Cir. 2004) (noting courts' wide discretion). A court is not required "to impose the least onerous sanction available," but may choose "the most appropriate sanction under the circumstances." *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999).

Courts in the Eighth Circuit regularly impose sanctions such as those contemplated in Fed. R. Civ. P. 37(b)(2)(i) and (ii) for failure to comply with discovery orders to produce documents. These sanctions take the form of orders prohibiting the disobeying party from presenting certain evidence relating to their discovery violation, or adverse inferences that are either specific and/or that find that missing documents would have been unfavorable for the disobeying party. *See Tholen v. Assist America, Inc.*, No. 17-cv-3919 (DWF/SER), 2019 WL 3293709, at *6 (D. Minn. Apr. 18,

2019) (imposing multiple adverse inferences under Fed. R. Civ. P. 37(b)(2)(A)(i) and (ii) after an employer failed to search for and produce an employment manual, including inferences that the content of the manual would be unfavorable for the employer's defenses), *report and recommendation adopted*, No. CV 17-3919 (DWF/SER), 2019 WL 2387109 (D. Minn. June 6, 2019); *Rightchoice Managed Care, Inc. v. Hospital Partners, Inc*., No. 5:18-cv-06037-DGK, 2020 WL 5733204, at *8 (W.D. Mo. Sept. 24, 2020) (prohibiting disobedient party from opposing counter-party's claims or introducing evidence in defense of counter-party's claims after failure to produce documents in violation of court orders); *Sheng Int'l Co. LTD. v. Prince Americas, LLC*, No. 8:20-CV-124, 2022 WL 1734492, at *10 (D. Neb. Apr. 26, 2022) (sanctioning disobedient party by issuing order taking fact favorable to counter-party as established); *HM Compounding Servs., LLC v. Express Scripts, Inc.*, 349 F. Supp. 3d 794, 800–01 (E.D. Mo. 2018) (sanctioning disobedient party by prohibiting it from introducing specific matters in evidence); *Carter v. Douglas Cnty., Nebraska*, 758 F. Supp. 3d 984, 1008 (D. Neb. 2024) (same).

Adverse inferences are also properly applied at the summary judgment phase. *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. Arrington*, 998 F.Supp. 2d 847 (D. Neb. 2014) *aff'd sub nom. U.S. Commodity Futures Trading Comm'n v. Kratville*, 796 F.3d 873 (8th Cir. 2015) (drawing on adverse inference in support of granting summary judgment); *Bogosian v. All Am. Concessions*, No. 06-CV-1633 RRM RML, 2011 WL 4460362, at *7 (E.D.N.Y. Sept. 26, 2011) (relying on adverse inference, imposed against plaintiff due to failure to produce documents, to grant summary judgment in favor of defendant); *Thomas v. Bombardier-Rotax Motorenfabrik, GmbH*, 909 F. Supp. 585, 586, 588–89 (N.D. Ill. 1996) (barring evidence relating to a plane crash because plaintiff destroyed the aircraft at issue and granting summary judgment).

**A. Suggested Alternative Sanction One: This Court should take certain facts as established under Rule 37(b)(2)(i).**

The Court has wide latitude, under Federal Rule of Civil Procedure 37(b)(2)(i), to direct that "facts be taken as established for purposes of the action, as the prevailing party claims." This sanction is properly imposed by taking specific facts as established as a remedy for discovery failures. *See, e.g., Tholen*, 2019 WL 3293709 at *6 (imposing multiple specific adverse inferences after an employer failed to produce an employment manual); *Sheng Int'l Co.*, 2022 WL 1734492 at *10 (sanctioning disobedient party for discovery failures by directing that part of the opposing party's case be taken as established). Moreover, of the sanctions permitted under Rule 37(b)(2), adverse inferences "designating that certain facts will be deemed established for purposes of th[e] lawsuit" are among the "least drastic." *Carlson v. Freightliner LLC*, 226 F.R.D. 343, 372 (D. Neb. 2004) *determination sustained sub nom. Carlson v. Freightliner L.C.C.*, 226 F.R.D. 385 (D. Neb. 2004) (deeming two facts established after party's failure to respond to certain written discovery). Additionally, courts in the Eighth Circuit have imposed similar sanctions for failure to comply with production orders even where, as here, the contents of tardy, non-produced documents were unknown. *See, e.g.*, *Rightchoice Managed Care, Inc.,* 2020 WL 5733204, at *7 (imposing sanctions on disobedient party for failure to comply with production order and noting that "[w]hat is even more concerning to the Court than the tardiness of the production is that it is still incomplete").

Given the magnitude of the Government's discovery failures in this case, the Court should take as established a number of facts that Defendants sought to establish through their discovery requests, and that could be established by the historical documents housed at DTIC or at NARA

(or elsewhere) that the Government has failed to produce.[13] Specifically, GD asks the Court to deem the following facts established:[14]

1) The Government used and disposed of TCE at the NOP site during ordnance or other operations before Convair arrived at the NOP site.

2) To the extent Convair and/or its contractors used or disposed of TCE at the NOP site, they did so only under the requirements, direction, control, supervision, and/or orders of the Government.

3) Convair did not design or construct the Atlas site infrastructure, including the flame buckets, engine exhaust channel, drain lines, and associated drainage ditches, which were designed and constructed by non-Defendant contractors under the supervision, control, and authority of the Government.

4) The Government represented repeatedly that it, and not Convair, would bear the risk of and pay any cost associated with all harms (which would necessarily include environmental damage) related to Convair's work at NOP.

5) The course of conduct between the Government and Convair created an assumption of liability by the Government for all costs, including environmental response costs, arising from Convair's work related to the Atlas project, including work at NOP.

**B. Suggested Alternative Sanction Two: The Government should be precluded from relying on a lack of evidence in support of its claims and defenses under Rule 37(b)(2)(ii).**

In addition, or in the alternative, to Sanction One, the Government should not be permitted to rely on the absence of historical documents to advance its position while simultaneously failing to meet its obligation to produce responsive historical documents, and should be sanctioned accordingly. In line with its authority under Fed. R. Civ. P. 37(b)(2)(ii) to prevent a disobedient

---

[13] These targeted sanctions hopefully address the Government's objections, asserted against GD's proposed lesser sanctions in its February 2026 filing (ECF No. 532), that GD's proposed sanctions were too "amorphous" or "broad." (*See* ECF No. 613 at 11–12.)

[14] In its Supplement to its Second Motion for Relief from the Government's Discovery Failures, Dow suggests the following as another adverse inference that may be considered: "[T]he TCE contamination near Load Line 1 at NOP . . . resulted from activities that did not involve Dow, such as the Government's operation of NOP for ordnance production in the pre-Atlas era when Dow was not present." (ECF No. 781 at 17–18.)

party "from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[,]" the Court should prohibit the Government from relying on a lack of documentary evidence to support its claims in this case. *See, e.g.*, *HM Compounding Servs.,* 349 F. Supp. 3d at 800–01 (sanctioning disobedient party by prohibiting it from introducing specific matters into evidence); *Carter*, 758 F. Supp. 3d at 1008 (same).

Throughout expert and fact discovery, the Government has repeatedly relied on the supposed absence of historic documentary evidence in support of its claims and defenses. For example, the Government's experts relied on the lack of historical documents to support their opinions:

- Dr. Jay Brigham, the Government's ordnance-era historical expert, opines that he does "not believe that TCE was used at the NOP during World War II," before GD's arrival, based in part "on the lack of documents showing that TCE was used at the NOP during these years[.]" (ECF No. 532-7 at 2.)

- Dr. Fredric Quivik, the Government's Atlas-era historical expert, similarly relies on the non-existence of historical records, opining that he has "seen no documentation to suggest that Rocketdyne's choice of TCE as the solvent came in response to an Air Force instruction" and that "[t]here is nothing in the historical record…to indicate that disposal of used TCE was one of the practices that [the Government] would have inspected or otherwise overseen." (ECF No. 532-8 at 7; ECF No. 532-9 at 24.)

- Mr. Steven Gruenwald, the Government's government contracts expert, also pointed in his deposition to the non-existence of evidence to support his opinion that there was nothing in the course of conduct of the parties that, as a matter of contract law, would create any assumption of liability by the Government for response costs pursuant to CERCLA. (ECF No. 532-10 at 61–67 (Q. Is there anything in the course of conduct of the parties that, as a matter of contract law, can be interpret[ed] as creating any such assumption of liability by the Government, or otherwise basis for immunity of the Defendants, from such liability? Did you come to a conclusion as to the answer to that question, sir? A. My answer is that I found no such thing. I'm aware of no such thing . . . no evidence of anything in the conduct that would lead to that result. . . . I allowed for the possibility that there would be something that either was identified by Mr. Burton or by the defendants or that I could find on my own that indicated a contrary understanding to what the words actually said for the purposes of interpreting what . . . rights the contract did or did not convey.).)

The Government has also repeatedly claimed that it lacks sufficient information to respond substantively to Defendants' discovery requests, again using the purported absence of historical

records to support its claims. For example, the Government responded to *over one hundred* of GD's Requests for Admission ("RFAs") along the lines of the response excerpted below—by claiming to have insufficient information "to enable it to admit or deny" the request:

> 389. Admit that the Air Force conducted Dual Propellant Loading Exercises at NOP without Convair present on the launch pad.
>
> **RESPONSE:** The United States has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny Request 389.

(ECF No. 532-11, RFA No. 389.)[15]

The Government claims it lacks sufficient information to respond to Defendants' RFAs regarding numerous topics, including contracts and specifications that go to the core issues in dispute, and the extent to which the Government conducted Atlas operations at NOP that could have contributed to the contamination at issue.[16] Yet the Government has failed to adequately and timely search its own historical records for a case it chose to file. Accordingly, the Court should

[15] Notably, the Government has already been forced to amend its response to GD's RFA No. 389 referenced above to admit "that the Air Force conducted certain Dual Propellant Loading Exercises at NOP without Convair present on the launch pad." (Ex. 25, United States' Aug. 10, 2026 Amended Responses to GD's Fourth and Eighth Sets of Requests for Admission, at 7.) The Government made this concession at GD's insistence in light of belatedly-declassified documents indicating dates certain on which the Air Force conducted DPLs at NOP in 1963 and 1964. (Ex. 34, Aug. 4, 2026 email from S. Futernick to B. Adkins, at 1; Ex. 35, June 12, 2026 Ltr. from W. Thomson to J. Franzen, at 1–3.) As discussed above, this is another example of how the new declassified documents have forced the Government to abandon untenable positions it took early on.

[16] *See e.g.*, ECF No. 532-12, United States' Nov. 4, 2024 Amended Responses and Objections to GD's First Set of RFAs (responses to GD RFAs 117–120 (lacking sufficient knowledge to admit or deny requests related to Rocketdyne specifications)); ECF No. 532-13, United States' Nov. 18, 2024 Responses and Objections to GD's Fourth Set of RFAs (responses to GD RFAs 388, 391 (lacking sufficient knowledge to admit or deny requests related to the Air Force's role in conducting Atlas operations at NOP)); and ECF No. 532-14, United States' Dec. 23, 2024 Responses and Objections to GD's Seventh Set of RFAs (responses to GD RFAs 436–437 (lacking sufficient knowledge to admit or deny whether the Air Force reimbursed GD for costs associated with purchase orders)).

exercise its authority under Fed. R. Civ. P. 37(b)(2)(ii) and prohibit the Government from pointing to an absence of documentary evidence (for which it is responsible by virtue of its discovery failures) to support its claims and defenses.

**C. Suggested Alternative Sanction Three: The Court should infer that the unproduced documents are unfavorable to the Government's claims under Rule 37(b)(2)(i).**

The Court should also exercise its authority under Fed. R. Civ. P. 37(b)(2)(i) to direct that "designated facts be taken as established for purposes of the action" by holding that the Government's failure to produce responsive documents in its possession gives rise to the adverse inference that the documents it has failed to produce are unfavorable to its claims. *See, e.g.*, *Tholen*, 2019 WL 3293709 at *6; *Sheng Int'l Co.*, 2022 WL 1734492 at *10.

This sanction is appropriate here because it is likely that the unproduced documents in the Government's possession contain evidence undermining the Government's claims. This is supported by certain declassified documents that were previously produced in the case which, as noted above, caused the Government to acknowledge, for the first time, that the Government conducted DPLs on the site without involvement of Defendants and used TCE in connection with the same.

The Court should acknowledge the strong probability that at least some of the remaining responsive documents would undermine or contradict the Government's claims by holding that the Government's discovery violations give rise to an adverse inference that the documents it has failed to produce are unfavorable to its claims and defenses.

**III. If the Government's Claims Are Not Dismissed, a 2027 Trial Date Should Stand.**

To the extent the Government's claims are not dismissed, awarding the lesser sanctions in Part II above would allow the trial to move forward as scheduled in March 2027, without requiring the parties to wait an indeterminate amount of time for the Government's belated productions.

As this Court has already acknowledged, "[A]n undue delay before trial is unacceptable to the Court and the parties." (ECF No. 689 at 9.) And for good reason. Courts in this Circuit recognize that delaying a set trial date creates prejudice by causing significant expense for litigants and disrupting the schedules of the court and the parties. *See, e.g.*, *E3 Biofuels, LLC v. Biothane, LLC*, No. 8:11CV44, 2013 WL 12121994 at *1 (D. Neb. June 7, 2013) *objections overruled*, No. 8:11CV44, 2013 WL 3337315 (D. Neb. July 2, 2013) (finding that delaying a set trial date "would be prejudicial" to a party because "[i]f trial were again postponed, [the party] would be required to invest significantly more time and money in this case."); *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008-09 (8th Cir. 1998) (holding that prejudice existed when new expert opinion would necessitate reopening discovery and continuing the trial date).

The trial date in this matter, originally set to begin in September 2026, has already been reset once due to the Government's discovery failures, resulting in additional burden to the parties. GD would be prejudiced by a further delayed trial because it would force GD to again expend substantial additional resources, and it would disrupt the schedules of the parties, witnesses, and the Court. Those resources have been invested and schedules planned both with the expectation of a trial early next year and to assure timely compliance with the numerous other progression deadlines leading to that trial date, some of which have either already passed because of the Government's delays or will soon. With each deadline that the Government has extended, GD has allocated significant resources to this matter to keep the schedule agreed to by the parties and ordered by the Court.

Moreover, a delayed trial would unduly reward the Government for its repeated discovery delinquencies—allowing it to shirk its discovery obligations with no consequence other than additional time to prepare for trial. Indeed, courts have recognized that a party should not benefit

from its own discovery failures. *See Navarro v. BP Expl. & Prod., Inc.*, No. 18-0534-JB-MU-C, 2019 WL 5445753, at *3 n.2 (S.D. Ala. Sept. 23, 2019) (sanctioning plaintiff for clear pattern of discovery violations where "staying further proceedings until the orders are obeyed [would] only reward Plaintiff's defiance of his obligations while at the same time prejudicing the Defendants' ability to timely litigate this matter"), *report and recommendation adopted*, No. 18-0534-JB-MU-C, 2019 WL 5431318 (S.D. Ala. Oct. 23, 2019); *Pully v. I.R.S.*, 939 F. Supp. 429, 439 (E.D. Va. 1996) (denying plaintiff's request to continue trial date and explaining "[t]he Court will not allow the plaintiff to complain of alleged prejudice to his case . . . when the plaintiff's own lack of diligence gave rise to the purported prejudice.") (internal parentheses omitted). If the trial is further extended here, the Government would benefit, at the expense of the Defendants, from its own delays. GD urges the Court, to the extent it does not dismiss the case, to order the lesser sanctions GD requests, keep the current trial setting unchanged, and instruct the Magistrate to progress the matter to trial in the absence of further document production by the Government but with the corresponding sanctions for that failure proposed above.

## CONCLUSION

For the foregoing reasons, GD respectfully requests that the Court dismiss the Government's claims; or, in the alternative, preserve the current March 2027 trial date and impose the alternative sanctions detailed above.

Dated this 4th day of September, 2026.

Respectfully submitted,

**Counsel for Defendant General Dynamics:**

**/s/ Steven D. Davidson**

Steven D. Davidson
Bar Number: 18684
Lindsay K. Lundholm
Bar Number: 22224
Brian Barmettler
Bar Number: 27017
Attorneys for Defendant General Dynamics Corporation
BAIRD HOLM LLP
1700 Farnam Street, Suite 1500
Omaha, Nebraska 68102
Telephone: (402) 344-0500
Fax: (402) 344-0588
Email: sdavidson@bairdholm.com
Email: llundholm@bairdholm.com
Email: bbarmettler@bairdholm.com

Wade A. Thomson
Steven M. Siros
Sarah L. Futernick
*Pro hac vice*
Attorneys for Defendant General Dynamics Corporation
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, Illinois 60654
Telephone: (312) 840-8613
Fax: (312) 527-0484
Email: wthomson@jenner.com
Email: ssiros@jenner.com
Email: sfuternick@jenner.com

Matthew S. Hellman
*Pro hac vice*
Attorney for Defendant General Dynamics Corporation
JENNER & BLOCK LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001
Telephone: (202) 639-6861
Fax: (202) 639-6066
Email: mhellman@jenner.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of September, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

**/s/ Steven D. Davidson**

## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d)(1)(D), I certify this brief complies with the requirements of NECivR 7.1(d)(1). Relying on the word-count function of Microsoft Word 365, this document contains 10,920 words. The word-count function was applied to all text, including the caption, heading, footnotes, and quotations.

**s/ Steven D. Davidson**