**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff and Counter-Defendant,<br><br>v.<br><br>GENERAL DYNAMICS CORPORATION<br><br>And<br><br>DOW CHEMICAL COMPANY,<br><br>Defendants and Counterclaimants. | ) | CIVIL ACTION NO. 8:23-CV-00416 |

**GENERAL DYNAMICS CORPORATION'S**
**<u>REPLY IN SUPPORT OF ITS MOTION FOR DISCOVERY SANCTIONS</u>**

As set forth in General Dynamics Corporation's ("GD") Motion (ECF No. 795), the Court previously found that the Government's discovery deficiencies were "willful," imposed a deadline of July 15, 2026 for the Government to "complete disclosures," including specifically "disclosures of declassified documents," and warned that sanctions, including dismissal, could be warranted if the Government either (1) failed to complete disclosure of responsive classified documents by July 15; or (2) produced "an unusually large number of documents as purported 'supplemental' discovery responses" after July 15 (ECF No. 689 at 19, 21–22). The Government indisputably violated both mandates by failing to complete its disclosures, including its classified document disclosures, by July 15 and producing large volumes of supplemental discovery after July 15. Nothing in the Government's Opposition (ECF No. 811) negates these facts.

The Government's continued discovery deficiencies will cause the case to linger—*potentially for years*—at GD's expense unless this Court sanctions the Government's "willful" violations by dismissing this case. Dismissal is clearly justified. Not only did the Government

fail to meet both requirements in the Court's Order, the Government continues to willfully violate its discovery obligations by refusing to review documents (including classified documents) from two key repositories the Government promised years ago to search pursuant to an agreed process *but never did*. In its opposition, the Government claims its discovery errors are "honest oversight[s]." (ECF No. 811 at 23, 25, 27, 34.) But that flies in the face of this Court's Order, which found that the Government failed to marshal appropriate resources and showed repeated disregard for numerous extensions provided to the Government over years. In a desperate act to avoid dismissal, the Government refuses to honor its prior agreements, makes misleading arguments about the parties' discovery record, and tries (unsuccessfully) to shift blame for its own shortcomings to Defendants.

Three undisputed facts make clear this case should be dismissed. First, the Government failed to review and produce all declassified documents by the Court-ordered deadline of July 15. Second, the Government has produced (and will continue to produce) huge volumes of supplemental documents after July 15, 2026. Third, the Government has been willfully disobedient and continues to disregard its discovery obligations. While the Government attempts creative arguments to muddle these facts, those arguments are all belied by the discovery record. The Government also does not dispute GD's claim that it could take *years* for the Government to fulfill its discovery obligations (ECF No. 795 at 17–22), and the Court made clear that it is "not willing to allow this case to remain unresolved for years after the case reasonably should have been tried." (ECF No. 689 at 23.) Accordingly, dismissal is warranted based on the Government's continued pattern of disregard for Court orders and discovery obligations. In the alternative, the lesser sanctions GD proposed under Federal Rule of Civil Procedure 37(b)(2) are appropriate and would allow the trial to proceed as scheduled.

## DISCOVERY BACKGROUND

The discovery record demonstrates three indisputable facts that warrant dismissal.

**A. Indisputable Fact No. 1: The Government failed to review and produce all declassified documents before the Court's July 15, 2026 deadline.**

There is no question that the Government failed to review and produce all responsive declassified documents in violation of the Court's Order. As explained in GD's Motion, the Government did not review or produce *any* classified documents housed at the Defense Technical Information Center ("DTIC") despite its clear agreement to do so in 2024. (*See* ECF No. 795 at 4–7; ECF No. 796-05 at 3 ("[W]e will run [the agreed search terms] through the public and non-public sections of [DTIC], and we will produce any responsive documents, subject to any necessary declassification.").) The Government admits as much (ECF No. 811 at 6), but now argues the DTIC documents were somehow "not part of the document set the Court ordered" it to declassify and produce by July 15, 2026. (ECF No. 811 at 19–20.) The Government's position, it seems, is because it neglected the classified DTIC documents it previously promised to produce and failed to specifically mention them in the court-ordered status reports *the Government prepared*, the DTIC documents were not within the universe of classified documents the Government was expected to produce. That argument is meritless. The Court's Order addressed the "full disclosure of classified documents" and made no carve-outs for classified documents the Government had explicitly agreed to produce but somehow neglected to. (ECF No. 689 at 5.) The Court also recently confirmed the DTIC documents are within the scope of its Order. (*See* ECF No. 814 (ordering the Government to file another status report regarding the DTIC documents "the Court previously ordered it to produce").)

The Government also failed to review documents from a second repository, NARA, using the parties' agreed search terms despite its agreement to do so in 2024. (*See* ECF No. 795 at 9–

11; ECF No. 796-11 at 1 (Government: "We have run all of your requested search terms through [NARA and other indexes] to identify responsive documents, and the documents we obtain from those locations have been, are being, and will be produced.").) Since GD filed its Motion, the Government disclosed that its NARA failure also implicates classified documents, explaining that "some information about restricted or classified documents may be available when searching via NARA's online catalog" and confirming it "did not use the public searchable online catalog to identify responsive classified documents." (ECF No. 806-08 at 1.) The Government does not (and could not) dispute that classified documents held at NARA are within the scope of the Court's Order. (ECF No. 811 at 15.) Thus, the Government clearly failed to produce responsive classified documents from at least two repositories despite previously committing to do so.

**B. Indisputable Fact No. 2: The Government has produced large volumes of supplemental documents after July 15, 2026.**

An independent ground for dismissal of this case is the indisputable fact that the Government produced over sixty thousand pages of supplemental documents after July 15, 2026 from various locations, with still more outstanding. (*See* ECF No. 795 at 5, 8–14 & n.12.) It remains unclear how many more voluminous productions the Government intends to make based on the hundreds of thousands of unique hits or more across the DTIC documents.[1] (ECF No. 795 at 7.) The Government does not dispute the Court warned production of an unusually large number of supplemental documents could result in sanctions, or that it made multiple such productions since July 15, 2026. (ECF No. 811 at 10–14.) Nor does the Government dispute that its non-classified DTIC productions are more than a year and a half late given the parties' February 24,

[1] If the Government's claims are not dismissed and the Government is not otherwise sanctioned such that the parties can proceed to trial without further productions, the Government must also produce the outstanding NARA documents, which had tens of thousands of search hits or more. (ECF No. 795 at 11, 21.)

2025 fact discovery deadline. (ECF No. 795 at 8.)

### C. Indisputable Fact No. 3: The Government has been willfully disobedient and continues to withhold documents it agreed to review and produce.

The Government characterizes its discovery failures at DTIC and NARA as "honest oversight[s]" that are "*not* the product of intentional and repeated disobedience with Court Orders." (ECF No. 811 at 25 (emphasis added).) The facts show otherwise.

This Court has already held that the Government's failure to timely produce declassified documents in this case was "willful." (ECF No. 689 at 21.) The Government "missed" every court-ordered declassified document production deadline leading up to the Court's April 29 Order, which the Court was repeatedly forced to reset. (*See id.* at 2.) The Court explained that the Government's conduct in delaying production of declassified documents was willful because the Government "had the capacity to produce the documents it [wa]s required to produce, but the United States simply . . . chose[] not to assign the appropriate priority and staff to get the job done." (*Id.* at 21–22.)

Now, the Government is continuing its pattern of willful disobedience because it refuses to review and produce DTIC and NARA documents that it explicitly and repeatedly agreed to review and produce. There is no dispute that the Government's prior agreements were explicit. As explained in detail in GD's Motion (ECF No. 795 at 6, 9–10), the Government clearly represented to GD on multiple occasions that it would (or had) run the parties' agreed search terms over both the DTIC and NARA databases and would review and produce any responsive documents hitting on those terms.[2]

---

[2] The Government's statements in its brief suggesting there was "ambiguity" in the parties' agreement to use the agreed search terms is meritless. (*See* ECF No. 811 at 6–7, 26.) There was no "ambiguity." In fact, the Government concedes that there was no ambiguity elsewhere in its brief, recognizing that it "stated it would" use the agreed search terms at DTIC and NARA. (*Id.*

Despite its clear promises, the Government now refuses to honor the terms of its production agreements.[3] Specifically, as demonstrated in GD's Motion (ECF No. 795 at 19–20), while the parties agreed in 2024 on specific search terms, the Government has now unilaterally decided to narrow the terms at DTIC, and not to collect, review, or produce *any* documents that do not hit on its unilaterally limited terms (including documents that are not electronically searchable wholly or in part). (*See* ECF No. 796-32 at 4.) In its recent status report, too, the Government made clear that it has unilaterally decided to even *further* limit the classified documents it will review at DTIC. Instead of reviewing the approximately 500 classified documents the already limited search terms hit on, the Government conducted an unexplained "meta-data review" and now says it will review only 220 (or fewer) of those 500 documents.[4] (ECF No. 813-1 ¶ 10.) And, of course, despite the fact that it never ran the agreed search terms at NARA, the Government refuses to conduct *any* additional review or production of NARA documents. (*See* ECF No. 811 at 8.) This is a willful abrogation of the Government's discovery responsibility.

**ARGUMENT**

As explained in Defendants' prior briefing, the Government's repeated and continued discovery failures warrant dismissal under Federal Rules of Civil Procedure 37(b) and 41(b) and pursuant to the Court's inherent authority. (ECF No. 795 at 22.) Alternatively, if the Court

---

at 25.) Moreover, the Government does not submit a sworn declaration from any individual involved in discovery at the time to back up such an argument, which is telling.

[3] Those prior agreements are binding. *See, e.g.*, *StoreWorks Techs., Ltd. v. Aurus, Inc.*, No. 19-CV-1527(HB), 2020 WL 12442099, at *2 (D. Minn. Dec. 23, 2020) (finding discovery agreement regarding search terms "binding on the parties and counsel" and any objections "waived"); *see also United States v. Morales*, 684 F.3d 749, 755 (8th Cir. 2012) (enforcing discovery agreement as "akin to a contract").

[4] The Government's unilateral limitations are improper. *See Hlavinka Equip. Co. v. CLAAS of Am., Inc.*, No. 8:22CV379, 2024 WL 665087, at *3 (D. Neb. Feb. 16, 2024) (noting "a responding party cannot unilaterally limit discovery").

declines to dismiss the Government's case, GD proposes alternative sanctions under Rule 37(b)(2), including adverse inferences. (ECF No. 795 at 22–29.) Awarding these lesser sanctions would allow the trial to move forward without further delay while the Government completes its discovery disclosures. (*Id.* at 29.)

The Government's retort is to try to downplay GD's prejudice and the significance of the documents at issue by reframing its behavior as merely a series of "inadvertent oversights" for which there should be *no consequences* apart from a narrow set of costs, which GD does not seek because they would be insufficient. (ECF No. 811 at 9, 31–32.) That the Government would argue that its discovery deficiencies are essentially no big deal is astounding. The Government's discovery conduct merits dismissal.

## I. GD Suffered Prejudice and Will Continue Suffering Prejudice if DOJ Is Not Appropriately Sanctioned

The Government asserts that its discovery failures have not prejudiced Defendants *at all*. (ECF No. 811 at 9.) That position ignores the prejudice GD has already suffered and will continue to endure if the Government is permitted to proceed without consequence, as well as what this Court already concluded.

As a preliminary matter, the Government does not acknowledge the serious prejudice GD has already suffered. This Court recognized that "an undue delay before trial is unacceptable to the Court and the parties" (ECF No. 689 at 9), and the Government's own authority confirms that prejudice can include "the excessive and possibly irremediable burdens or costs imposed on the opposing party" through failure to timely produce documents. *Coral Grp. v. Shell Oil Co.*, 286 F.R.D. 426, 436 (W.D. Mo. 2012). Those burdens are not hypothetical here. The Court already continued trial once to accommodate the Government's willful failures, and very well may have to continue trial again (if the case is not dismissed). In the interim, GD reallocated resources,

devoted substantial attorney and expert time to reviewing and analyzing late productions, and repeated fact and expert discovery tasks that would not have been necessary had the Government met its obligations in the first instance. (ECF No. 795 at 30.) As the Government continues to disclose deficiencies, GD has been forced to repeat these steps again and again, compounding the prejudice with no end in sight.

This prior prejudice continues to be relevant because it impacts the cumulative impact of the Government's persistent discovery failures, which the Government ignores. The Government considers only the impact of each particular failure, standing alone. (*See* ECF No. 811 at 11–15, 19–22.) To be clear, each individual failure has seriously prejudiced GD. But as GD explained in its Motion, the Government's accumulated delays, misrepresentations, and belated disclosures have also called into question the integrity of the Government's *entire* discovery process. (ECF No. 795 at 11–14.) Each new revelation confirms that GD cannot rely on the completeness of the Government's productions or search process. That collective failure amplifies GD's prejudice. *See Schubert v. Pfizer, Inc.,* 459 F. App'x 568, 572–73 (8th Cir. 2012) (affirming dismissal where the district court emphasized the "combined impact" of multiple discovery violations and the "clear pattern of discovery malfeasance" demonstrated in the case).

GD also faces concrete prejudice going forward. Eight weeks after it first disclosed the DTIC failure, the Government still cannot even estimate when it will complete its DTIC productions. In its latest status report, the Government stated the Department of War was "working toward beginning the declassification process," but provided no estimated timeline for completion. (ECF No. 813 at 1–2.) Tellingly, the Government does not dispute GD's showing that

declassification of the DTIC documents alone could take *years*.[5] (ECF No. 795 at 17–18, 20–21.) And, the Government has now disclosed that classified documents are implicated at NARA, too—those additional documents could further compound the already years-long delay.

The Government's assurance that Defendants "will not have to redo work" because the Court has stayed unexpired deadlines (ECF No. 811 at 20) is cold comfort. GD is already being forced to "redo work" because the Court (again) stayed all case progression deadlines due to the Government's discovery failures on September 10, 2026, *after* the completion of follow-on written discovery, and only one day before the deadline for amended expert disclosures. (*See* ECF No. 814, ECF No. 801 at 1, ECF No. 698 at 1.) Given the timing, GD was preparing for follow-on fact depositions and nearing completion of its work on amended expert disclosures, and it will be forced to duplicate these efforts, and its efforts regarding follow-on written discovery, if the case progression deadlines are reset. More broadly, GD is prejudiced here because it cannot plan for follow-on fact discovery, expert supplementation, dispositive briefing, or trial based on a production completion date the Government describes as a "known unknown." (ECF No. 788-1 ¶ 20.)

That open-ended delay carries a cost recognized in the Government's own caselaw: "the irretrievable loss of evidence" and "the inevitable dimming of witnesses' memories." *Coral Grp.*, 286 F.R.D. at 436. Events most relevant to GD in this case occurred more than sixty-five years ago. Accordingly, the few potential fact witnesses still living are elderly. Similarly, some of GD's expert witnesses are older, as their expertise is derived in part from their experience during relevant

[5] The Government also disclosed in its recent status report that production of non-classified "CUI" documents at DTIC has proven "more complicated than expected" and approximately one third of those documents will require "consent from the 'controlling organization'" before production. (ECF No. 813-1 ¶ 8.) This will likely contribute to additional delays.

periods dating back to the 1960s. With every delay, the risk that key live testimony may become unavailable increases.

The Government is also compounding GD's prejudice with its continued disregard for the parties' prior agreements. The Government now refuses to review the DTIC and NARA documents that hit on the search terms it agreed to in 2024, has unilaterally narrowed those terms at DTIC, and is making "pass-through" productions of tens of thousands of pages that shifts the burden of responsiveness review onto GD.[6] (*See supra* at 4–6; *see also* ECF No. 795 at 19–21.) The Government suggests that GD cannot be prejudiced by the Government's failure to run the agreed search terms at NARA because Defendants had "equal access" to NARA's public database. (ECF No. 811 at 21–22.) But that does not limit the Government's discovery commitments or excuse its failures. As GD has repeatedly explained, the law makes clear that the Government alone was obligated to search for, review, and produce the responsive documents at issue here, notwithstanding that they are partially housed in public databases. (*See* ECF No. 795 at 8 n.4.) Moreover, GD had no reason to review DTIC or NARA documents in 2024 because the Government represented that it was already doing so.[7]

The Government points out that GD performed some searches at DTIC and NARA (*id.* at 7, 21, 27), but that is inapposite. GD performed limited, targeted searches for specific research purposes, but it did not conduct a comprehensive review for all documents hitting on the agreed

---

[6] As Dow explains in its Response to GD's Motion, courts recognize it is the producing party's obligation to review for responsiveness. (ECF No. 804 at 21.)

[7] The Government also attempts to blame Defendants for not "follow[ing] up" with the Government about the DTIC and NARA productions. (ECF No. 811 at 7, 27.) But the Government repeatedly represented that it had run the agreed search terms over those databases and was producing responsive documents, and Defendants had no reason to doubt those representations at the time.

search terms responsive to GD or Dow's Requests for Production precisely because that was the Government's obligation,[8] and the Government assured Defendants that it was doing so, which Defendants had no reason to doubt.[9] The Government also argues, in an attempt to contextualize its discovery mistakes, that GD "had access to non-public files" at DTIC based on GD's 2024 request for two specific DTIC documents. (ECF No. 811 at 27.) This is not true. GD requested the two referenced DTIC documents precisely because it could not access them on the database's non-public side.[10] The Government's refusal to honor its agreements has already forced GD to divert substantial resources to review pass-through productions and brief issues it thought were resolved by agreement in 2024.

The Government also notes that it has produced more documents and responded to more written discovery requests than Defendants. (*See id.* at 5.) This argument is meaningless, and in no way relieves the Government of its discovery promises. Indeed, it is expected that the Government would have more discoverable information here, where GD had responsibilities at

---

[8] Because GD's limited DTIC searches did not duplicate, and could not now reduce, the Government's agreed search obligations at DTIC, there was no reason for GD to discuss its prior research efforts when the Government inquired. (*See* ECF No. 811 at 7.)

[9] The Government also argues that a NARA "production is no longer proportional to the needs of the case" because of the parties' expert searches in NARA's archives and the Government's other NARA productions. (ECF No. 811 at 27.) But *nothing has changed* regarding the relevance and probity of the NARA documents at issue since the parties' 2024 agreement regarding their production. The experts did not perform the search-term review the parties agreed to, and the Government's other NARA productions were deficient for the same reason. The only thing that has changed is that the Government failed to act on its agreement for two years.

[10] GD identified the two records from the public side of the DTIC database. In a section of a letter titled "Non-Classified Documents," GD explained to the Government that it "is aware of certain responsive documents available through the non-public side of DTIC that are inaccessible due to broken or 'dead' links" and asked: "To the extent the Government has access to these documents on the non-public side of DTIC, or can otherwise access the materials despite the broken links, please produce them to GD." (Declaration of Steven D. Davidson, Ex. 1, Sept. 26, 2024 Ltr. from W. Thomson to F. Phillips at 4–5.) GD has not accessed classified documents at DTIC.

NOP for only approximately four years and, in stark contrast, the Government "has spent decades" at the site, both before and after GD arrived. (*Id.* at 2–4; *see also* ECF No. 506 at 6–7 (Government's presence at NOP began more than 80 years ago).) The Government was well aware of the parties' disproportionate presence at the site and the corresponding scope of discovery when it initiated this lawsuit, when it agreed the parties would be allowed unlimited Requests for Production and Requests to Admit, and when it agreed to the initial December 23, 2024 written discovery deadline, which it repeatedly failed to meet despite numerous extensions from the Court. (*See* ECF No. 31 at 10; ECF No. 39 at 1.) Similarly, the Government was well aware this case involved classified documents since at least 2019, years before it filed this lawsuit, and GD provided the Government with a list of specific locations of classified documents in January 2024, before it agreed to the case progression order. (*See* ECF No. 532 at 2–3 (detailing case timeline regarding production deadlines and classified documents); ECF No. 689 at 17.)

The Government also argues GD attempts to "manufacture prejudice" by insisting that, if this case is not dismissed, the Court should impose the adverse inferences GD requested and proceed with a trial without the DTIC and NARA documents rather than waiting for years for the Government to complete its discovery obligations. (ECF No. 811 at 30.) The fact that GD is willing to proceed to trial if necessary without all Government documents is not manufactured prejudice but rather a solution to *mitigate* the prejudice. GD has no confidence that the Government can or will complete its productions, and GD should not be made to wait years for resolution of claims the Government chose to bring.

## II. Dismissal is an Appropriate Sanction

The Court should dismiss the Government's claims against Defendants for the reasons explained in Defendants' briefing. (ECF No. 795 at 22; ECF No. 747 at 23–30; ECF No. 781 at 3–5, 13–18; *see also* ECF No. 506 at 22–26.) The Government argues that "[d]ismissal for failure

to obey a discovery order typically requires a pattern of repeated, intentional disobedience." (ECF No. 811 at 22.) But that is exactly what the Government has done here. *First*, the Court already determined that the Government acted willfully in failing to comply with discovery orders. (ECF No. 689 at 21.) *Second*, as described above, the Government is intentionally disobeying its discovery obligations by (a) refusing to review or produce the full scope of DTIC documents as agreed; (b) refusing to conduct a responsiveness review of the DTIC documents, shifting the burden to GD to do so; and (c) refusing to undertake *any* efforts to review the NARA documents it failed to search and review as agreed. (*See supra* 3–6*; see also* ECF No. 795 at 19–21.) Thus, the Government has demonstrated a pattern of repeated, intentional disobedience and dismissal is warranted.[11]

## III. If Dismissal is not Granted, the Court Should Impose GD's Alternative Sanctions and Allow the Case to Promptly Proceed to Resolution.

GD asks the Court to consider three alternative sanctions in the event the Court declines to dismiss the Government's claims: (1) impose an adverse inference that certain specific facts are taken as established; (2) preclude the Government from relying on a lack of evidence to support its claims and defenses; and (3) impose an adverse inference that the unproduced documents are unfavorable to the Government's claims and defenses. (ECF No. 795 at 22–29.) The Government makes no attempt to rebut these alternative sanctions with any specificity. Instead, it argues the Court "should not impose any adverse inference" because (1) the Government has not acted in bad

[11] The Government argues that dismissal would be unfair to the American taxpayers (ECF No. 811 at 24), but it is the Government that has treated the American taxpayers unfairly by squandering Government resources initiating complex litigation it could not adequately support. Moreover, if this case is not dismissed, GD will demonstrate that the Government already agreed to hold GD harmless for its critical help at NOP during a time of great national exigency. GD should never have been sued, much less subjected to never-ending discovery costs because of the Government's willful violations of Court deadlines.

faith[12]; and (2) Defendants have not shown that the DTIC and NARA repositories contain sufficiently relevant documents. (ECF No. 811 at 25.) GD addresses why each of these contentions fail in turn.

**A. GD has demonstrated all elements required for its proposed sanctions.**

The Government contends that because it has not engaged in "bad-faith conduct," no adverse inference is appropriate here. (ECF No. 811 at 25.) As an initial matter, for a court to impose sanctions under Fed. R. Civ. P. 37, there must be (1) an order compelling discovery, (2) a willful violation of that order, and (3) prejudice to the other party. *Rightchoice Managed Care, Inc. v. Hosp. Partners, Inc.*, No. 5:18-CV-06037-DGK, 2020 WL 5733204, at *7 (W.D. Mo. Sept. 24, 2020) (quoting *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1019 (8th Cir. 1999)). GD has already established each of these required elements. Moreover, even in the context of dismissal, a more severe sanction, courts only require that failure to comply with a discovery order was due to either willfulness or bad faith. *See Cross v. Gen. Motors Corp.*, 721 F.2d 1152, 1155 (8th Cir. 1983). As addressed above, this Court already found the Government willfully violated discovery orders, and it continues to be willfully disobedient regarding the DTIC and NARA documents.

The Government also contends that because it disclosed to the Court and Defendants that it failed to search for or produce documents from DTIC or NARA as agreed, its hands are somehow clean. (ECF No. 811 at 25-26.) But the Government is not off the hook merely because it made

[12] The Government expects GD and the Court to take its word that its failure to "review and produce responsive material from DTIC as it said it would in 2024 . . . was an honest oversight." (ECF No. 811 at 27.) But GD questions whether the Government actually knows one way or the other. In disclosing its DTIC failures, the Government confirmed that due to attorney turnover, it does not know what its litigation team discussed in 2024, even going so far as to *ask Defendants* to verify whether the parties made an agreement that would relieve the Government of its discovery obligations (they did not). (ECF No. 795 at 6 n.2.) The Government cannot claim ignorance when that helps its narrative while also asserting contemporaneous errors were merely honest mistakes.

required disclosures. The disclosed deficiencies are just more examples of willful discovery violations, and, far from owning up to them, the Government attempts to minimize its behavior *after* its disclosures, including its unilateral narrowing of the relevant DTIC document universe, the prejudicial "pass-through" production of 48,000 pages of DTIC documents over Defendants' objections, and its outright refusal to do *anything* to correct its NARA misrepresentations. (*See supra* 3–6*; see also* ECF No. 795 at 19–21.) The Government's treatment of its latest discovery deficiencies demonstrates the Government's continuing disregard for its obligations and this Court's orders.

**B. The DTIC and NARA repositories are likely to contain probative and relevant information.**

The Government's claim that Defendants "invite error" by "speculating" about the importance of the unproduced DTIC and NARA documents lacks merit. (ECF No. 811 at 28.) It goes without saying that GD cannot conclusively opine on the relevance of documents it has not seen, but nevertheless, there is a persuasive basis to conclude that the unproduced DTIC and NARA documents are likely to contain highly relevant information.

*First*, the Government complains that GD failed to identify specific, relevant DTIC or NARA documents (ECF No. 811 at 30), but it fails to acknowledge that the Government did not produce *any* DTIC documents (beyond the two GD requested in 2024) until it dumped over 48,000 pages *the day GD filed its Motion*—accordingly, GD could not have discussed those documents in its initial brief. (*See* ECF No. 795 at 19 n.12.) GD has since devoted significant resources to conduct a responsiveness review of the recently produced DTIC documents (although it was the Government's burden to do so) and confirmed that the documents are highly relevant to the issues in dispute, including TCE cleanliness specifications, flush and purge procedures, and Rocketdyne

safety reports.[13] Additionally, as GD explained in its Motion, the Government agreed to search DTIC for Rocketdyne Quarterly Program Progress Reports, which the Government does not dispute are highly relevant. (ECF No. 795 at 11 n.9.) Similarly, NARA documents previously produced are demonstrably probative, including NOP-specific Semi-Annual Command Histories and Inspection Reports that provide key information regarding the operational history of NOP and Government ordnance activities.[14] Thus, it is very likely that the remaining unproduced documents will contain additional relevant information. The Government provides no legitimate basis or explanation otherwise.[15]

*Second*, the Government downplays how its prior late-produced documents (that it sought to withhold) forced it to amend inaccurate merits positions it took in fact discovery and in prior litigation. (*See* ECF No. 795 at 14–16.) As an example, GD explained in its Motion that in *Kirchmann v. United States* (a case brought by the Kirchmann family against the Government for

---

[13] *See, e.g.*, DTIC_0011694 at 1711, 1768 (reflecting Convair's compliance with Rocketdyne's MA-2 engine system specifications and applicable TCE cleanliness specifications); DTIC_0011142 at 1145-51 (addressing Convair post-static firing securing procedure discussing solvent flushing and Rocketdyne manuals); DTIC_0003207 at 3252–54 (Rocketdyne Missile System Safety report for the Atlas MA-3 engine system describing TCE use); DTIC_0001910 at 1950–52 (discussing cleanliness standards for propellant loading systems).

[14] *See, e.g.*, MA0002443 at 2535 –2592 (History of Nebraska Ordnance Plant, Part XII, September 30, 1945) (containing NOP's post-war Shutdown and Decontamination Procedure); GD-D_MED_0030137 at 0140–0142 (History of Nebraska Ordnance Plant, June 30, 1951) (providing information on Ordnance Department contracts during standby period for cleaning, preservation, and storage at NOP of war reserve machines and tools); MA0000215 at 0231–0233 (History of Nebraska Ordnance Plant, June 30, 1952) (discussing the recommencement of ordnance activities at NOP following standby period).

[15] The Government points to Defendants' historical expert's testimony to argue that because there was already a "robust" historical record, key historical documents must not be missing. (ECF No. 811 at 14.) But the same expert testified that "the historical record is clearly incomplete. . . . We don't have a significant number of detailed records." (ECF No. 810-13 at 140:9–14.) The Government's own historian agrees. For example, his opinion that TCE was not used at NOP before 1950 explicitly rests on the lack of record documents on that issue. (ECF No. 532-7 at 2.)

contaminating NOP with TCE), the Government failed to produce documents in its possession showing Government use of TCE at NOP, and the court ultimately dismissed the case in part based on the Government's representations to this Court about the Government's (lack of) TCE use. (*See* ECF No. 795 at 16.) We now know from declassified documents in this case that the Air Force did indeed use TCE in operating NOP, meaning that the Government was able to extract a favorable ruling in a prior case despite the fact that contrary information was in its possession. The Government ignores the *Kirchmann* case entirely in its Opposition, and this point demonstrates that the Government cannot credibly claim any of its unproduced documents are of no consequence.

Similarly, throughout the fact discovery period, the Government took the position in various written discovery responses that it lacked sufficient information regarding whether the Government conducted Dual Propellant Loadings (DPLs) and denied that it was required to use TCE. (*See, e.g.*, ECF No. 796-23 at 7; ECF No. 749-24 at 9–10.) At GD's insistence, the Government was forced to amend its positions to correct its prior (inaccurate) responses.[16] (ECF No. 795 at 15–16.)

In short, the Government would likely still maintain its untenable and inaccurate TCE-use position had it succeeded in withholding its late-produced documents. Like the declassified

[16] The Government attempts to downplay the significance of the late-produced declassified documents by arguing that it had already admitted some responsibility for conducting DPLs through its allocation expert, who offered an estimate of the number of DPLs performed during periods when the Air Force was in control at NOP. (ECF No. 811 at 18.) This ignores two key points: (1) Despite its allocation expert's analysis, the Government maintained its written discovery position until August 2026, long after the close of fact and expert discovery, that it lacked information regarding whether it had conducted DPLs at NOP after GD left the site (*see* ECF No. 796-26 at 7–8); and (2) the Government's allocation expert's analysis itself relied on recently declassified documents that were produced *after* the close of fact discovery. (ECF No. 552-1 ¶¶ 64–68.)

documents that forced the Government to amend its TCE-use position, the missing DTIC and NARA documents address similar historical topics, and the withheld documents are likely to contain similar revelations.

**C. The Court can determine how to best sanction the Government to address Dow's prejudice.**

Dow argues that GD's alternative sanctions would not cure Dow's prejudice because its litigation positions differ from GD's. (ECF No. 804 at 22.) Dow does, however, concede that an adverse inference that likely "eliminates Dow's liability" could remedy its prejudice and particularly suggested such an inference in its Supplemental Brief. (*Id*. at 22; ECF No. 795 at 26, n.14.) The Court has broad discretion under Fed. R. Civ. P. 37(b)(2) to impose whichever sanctions it sees fit to address Dow's prejudice. (ECF No. 795 at 23.) In the event the Court declines to dismiss the Government's claims, the Court can craft the most appropriate sanctions as to GD and Dow under the circumstances. *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999).

**D. Any award of costs would be insufficient.**

Although GD expressly reserves the right to seek costs at a later date, GD did not seek costs in this Motion because costs would be insufficient to address the Government's egregious conduct and would not cure GD's prejudice. *See, e.g.*, *Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, No. CV 17-5009 (JRT/KMM), 2020 WL 4915832 at *5 (D. Minn. Aug. 21, 2020) (noting that costs "are the least severe of all sanctions authorized by Rule 37(b)" and imposing both cost sanctions and an adverse inference due to willful discovery violations); *see also Chrysler Corp.*, 186 F.3d at 1022 ("The district court is not constrained to impose the least onerous sanction available, but may exercise its discretion to choose the most appropriate sanction under the circumstances."). Unlike an award of costs, GD's alternative lesser sanctions allow the parties to

proceed to trial on the merits as soon as possible—a result the Government explicitly seeks in its Opposition. (*See* ECF No. 811 at 20–21 ("[T]he United States' interest remains in bringing this case to trial on the merits promptly).")

**CONCLUSION**

For the foregoing reasons, GD respectfully requests that the Court dismiss the Government's claims; or, in the alternative, preserve the current March 2027 trial date and impose the alternative sanctions detailed above and in its Motion.

Dated this 9th day of October, 2026.

Respectfully submitted,

**Counsel for Defendant General Dynamics:**

**/s/ Steven D. Davidson**
Steven D. Davidson
Bar Number: 18684
Lindsay K. Lundholm
Bar Number: 22224
Brian Barmettler
Bar Number: 27017
Attorneys for Defendant General Dynamics Corporation
BAIRD HOLM LLP
1700 Farnam Street, Suite 1500
Omaha, Nebraska 68102
Telephone: (402) 344-0500
Fax: (402) 344-0588
Email: sdavidson@bairdholm.com
Email: llundholm@bairdholm.com
Email: bbarmettler@bairdholm.com

Wade A. Thomson
Steven M. Siros
Sarah L. Futernick

*Pro hac vice*
Attorneys for Defendant General Dynamics Corporation
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, Illinois 60654
Telephone: (312) 840-8613
Fax: (312) 527-0484
Email: wthomson@jenner.com
Email: ssiros@jenner.com
Email: sfuternick@jenner.com

Matthew S. Hellman
*Pro hac vice*
Attorney for Defendant General Dynamics Corporation
JENNER & BLOCK LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001
Telephone: (202) 639-6861
Fax: (202) 639-6066
Email: mhellman@jenner.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of October, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

**/s/ Steven D. Davidson**

**CERTIFICATE OF COMPLIANCE**

The undersigned, pursuant to NE. Civ. R. 7.1(d)(1)(D)(4), hereby certifies that the foregoing brief complies with all requirements of subsection (d)(1). This certification relies on the word-count function of my word-processing software, Microsoft Office 365. The word-count function, which included all text, including the caption, headings, footnotes, and quotations, calculated that this brief contains 6,336 words.

**/s/ Steven D. Davidson**